319 P.3d 432

Mark C. KELLBERG,
Petitioner/Plaintiff–
Appellant,

v.

Christopher J. YUEN, in his capacity as
Planning Director, County of Hawai'i,
and County Of Hawai'i, Respon-
dents/Defendants–Appellees.

No. SCWC–12–0000266.

Supreme Court of Hawai'i.

Jan. 22, 2014.

Robert H. Thomas and Mark M. Murakami, Honolulu, for petitioner.

Michael J. Udovic, Hilo, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by POLLACK, J.

This appeal arises out of a decision by Respondents/ Defendants–Appellants Christopher J. Yuen in his capacity as Planning Director of the County of Hawai'i (Planning Director) and the County of Hawai'i (County) (collectively, "County Defendants"), to approve a subdivision on the subject property. Petitioner/Plaintiff–Appellant Mark C. Kellberg (Kellberg), an adjacent land owner, filed an action in the Circuit Court of the Third Circuit (circuit court) challenging the subdivision approval. The circuit court granted summary judgment on all counts in favor of the County Defendants. In his Application for Writ of Certiorari (Application), Kellberg seeks review of the July 19, 2013 Judgment on Appeal of the Intermediate Court of Appeals (ICA), filed pursuant to its June 20, 2013 Memorandum Opinion, vacating the circuit court's judgment and remanding for an order dismissing the case. For the reasons

set forth herein, we vacate the ICA's judgment and remand the case to the ICA for consideration of the remaining issues raised by Kellberg in his appeal to the ICA.

## I. BACKGROUND

### A. *Subject Property*

The subject property is a 49–acre parcel of land located in Ninole, County of Hawai'i (Subject Property). Kellberg owns property adjacent to the Subject Property. On May 22, 2000, Virginia Goldstein, the Planning Director at the time, sent a letter to Robert Williams,[1] President of Prudential Orchid Isle Properties, reflecting the Planning Department's determination that the Subject Property consisted of six pre-existing lots.[2] A map was attached to Goldstein's letter, reflecting five adjoining lots in the larger 48.47–acre portion of the Subject Property, and a sixth smaller, 0.600–acre non-contiguous lot (identified as Lot 4 on the map).

In December 2003, the then-owners of the Subject Property wrote to Christopher Yuen, who had taken over as Planning Director, stating that they would like to consolidate and re-subdivide the property. The owners wrote that it was their belief that there were at least "<u>seven</u> usable lots of record located" on the property. (Emphasis added). On June 2, 2004, the Planning Director responded to the owners and wrote that based on a review of the relevant records, the Planning Department had determined that "the subject property consist[s] of <u>two (2)</u> separate legal lots of record[.]" (Emphasis added). One of the lots included the small non-contiguous plot.

In 2004, Michael Pruglo purchased the Subject Property. In a letter dated January 15, 2005, Sidney M. Fuke, a planning consultant working with Pruglo, wrote to the Planning Director to memorialize a January 12, 2005 discussion between Fuke and the Director. Fuke wrote that at the January 12

meeting, the Director confirmed that he "would accept the six (6) lots acknowledged in the May 22, 2000 letter as lots of record[.]"

On April 7, 2005, Fuke filed a "Consolidation/Resubdivision Application" (SUB 05–000064) with the Planning Department, on Pruglo's behalf. In the accompanying letter, Fuke reiterated that pursuant to Goldstein's May 22, 2000 letter and Fuke's January 15, 2005 discussion with the current Planning Director, the Subject Property was determined to have six pre-existing lots.

The preliminary plat map included with the application, dated April 6, 2005, identifies the larger 48–acre portion of the Subject Property as "Parcel 1," and divides Parcel 1 into six lots, labeled "1–A" through "1–F." However, the smaller, 0.6–acre non-contiguous lot from the Planning Department's May 22, 2000 letter is not included as part of the proposed subdivision. Instead, the non-contiguous lot is labeled "Parcel 2."

On June 1, 2005, the Planning Director granted tentative approval of the preliminary plat map.

On July 1, 2005, Fuke submitted a final plat map to the Planning Director. Consistent with the preliminary map, the final plat map identifies the larger portion of the Subject Property as "Parcel 1" and shows this portion divided into six lots. The smaller non-contiguous portion of the property, while reflected in the map, is no longer identified as "Parcel 2" or by any label.

On July 11, 2005, the Planning Director sent a letter to Fuke, providing, "FINAL SUBDIVISION APPROVAL NO. SUB–05–000064." The letter stated, "Please be informed that <u>final subdivision approval for recordation is hereby granted</u> to the final plat map as attached herewith inasmuch as all requirements of the Subdivision Code, Chapter 23, as modified have been met." (Emphasis added).

---

1. Ms. Goldstein was responding to Mr. Williams' letter of April 10, 2000 regarding determination of pre-existing lots on the subject property.

2. § 23–3(21) of the Hawai'i County Code (Supp. 2010) defines "pre-existing lot" to mean "a specific area of land that will be treated as a legal

lot of record based on criteria set forth in this chapter." § 23–118 (2005) sets forth the relevant criteria for a pre-existing lot. A lot is a preexisting lot if it was created and recorded prior to November 22, 1944. § 23–118(a).

According to Kellberg, he first became aware of the subdivision of the Subject Property a month later on August 11, 2005, when he observed a "for sale" sign on the Subject Property, and a realtor later called him with an offer to sell him a newly created lot along his property line. The next day, he went to the Planning Department. He asked an employee about filing an appeal and was informed that the thirty-day period for appeals had already passed. He asked to speak to the Planning Director, but was told that he was unavailable. Kellberg then left his contact information and asked that the Director call him later that day. When the Director did not contact him as requested, Kellberg again visited the Planning Department on August 16 and left his contact information. However, the Director did not call him.

In a letter dated August 16, 2005, Kellberg informed the Planning Director that he had recently learned of the subdivision approval and that he was "writing to make [the Planning Director] aware of serious omissions and errors" in the approved subdivision plan. In relevant part, Kellberg noted that the final subdivision plan on file with the Planning Department divides the Subject Property into seven lots rather than six lots. The seventh lot consisted of the smaller, non-contiguous parcel reflected in the Planning Department's May 22, 2000 map as Lot 4. Kellberg wrote, "Your agreement to honor the previous administration's six pre-existing lot determination (as per your 01/12/05 meeting with Mr. Fuke), allows a six lot subdivision of the subject property, while the 'final' subdivision plan on file with your office divides the subject property into seven lots."

Kellberg concluded his letter by stating that he "can appreciate that at this late date, the errors and omissions I have noted will be difficult to correct, and certainly inconvenient for all parties involved." He wrote, "I would encourage your prompt intervention in this matter[.]"

On October 19, 2005, the first subdivision lot was sold.

In a letter dated January 17, 2006, Kellberg again wrote to the Planning Director. He stated that in the five months since his first letter, he had called the Planning Director's office and left numerous messages, with no response. He reiterated that the most serious error in the subdivision approval was that it failed to recognize Lot 4 and created seven lots instead of the agreed-upon six lots. He concluded by requesting a response and an account of the steps the Planning Director had taken to correct the identified errors.

On February 17, 2006, Kellberg wrote to the County of Hawai'i Office of the Corporation Counsel (Corporation Counsel) with his concerns regarding the subdivision. Corporation Counsel responded on February 24, 2006, and encouraged Kellberg to continue attempting to contact the Planning Director and also noted that Kellberg could consider appealing the matter to the Hawai'i County Board of Appeals (BOA).

In a letter dated March 5, 2006, Kellberg wrote to the Planning Department, stating that he was writing "at the suggestion of Corporation [Counsel] ... to request information concerning the [BOA]."

On March 21, 2006, the Chairman of the BOA responded to Kellberg's March 5 letter to the Planning Department. The Chairman stated that "[a]ccording to our records, the Planning Director granted Final Subdivision Approval on July 11, 2005 for the 6–lot subdivision of the subject property." (Emphasis added). The Chairman continued by informing Kellberg that the BOA rules required an appeal from the Planning Director's decision to be filed within thirty days of the decision: "For your information, Section 8–3, Time Limit for Filing Appeal, of Part 8 ... states that an appeal from the decision of the Planning Director shall be filed within thirty (30) days after the decision." A copy of the BOA's Rules of Practice and Procedures and a General Petition form were enclosed with the letter.

On April 19, 2006, Pruglo and Fuke submitted a new consolidation and resubdivision application for the Subject Property (SUB 06–000333). The plan involved consolidating the non-contiguous parcel with another par-

cel created by the previous subdivision.[3]

On June 19, 2006, Kellberg wrote a third letter to the Planning Director.[4] According to Kellberg, he had become aware of the pending subdivision application and asked the Planning Director to notify him when the subdivision application was approved.

On August 25, 2006, Kellberg's counsel, Stephen D. Whittaker, wrote to the Planning Director at Kellberg's request. The letter provided that it was regarding "Subdivision Plan SUB–05–000064; Resubdivision Plan 06–000333." Whittaker wrote that it was his assumption that "an appeal is premature in that Mr. Kellberg has not received notice of any action purporting to approve the 'resubdivision' . . . and on June 19, 2006, he asked, in writing, to be notified 'when tentative approval has been granted . . . for the resubdivision.' "

On October 23, 2006, more than a year after Kellberg's first letter, the Planning Director responded by letter to Kellberg and Whittaker. The Director stated that he was writing in response to Kellberg's letters of August 16, 2005, January 17, 2006, and June 19, 2006, and to Whittaker's letter of August 25, 2006. The Director wrote, "The number of pre-existing lots on [the Subject Property], and their subsequent use in Sub. 05–00064 and the pending Sub. 06–000333 seems to be the most important issue."

With respect to the number of pre-existing lots, the Planning Director acknowledged that the Planning Department had previously recognized six lots on the subject property, per the Department's May 22, 2000 letter. The Director further acknowledged that in the Department's June 2, 2004 letter, the Department only recognized two lots. The Director stated, "This was a mistake, because the Department should have respected the previous determination."

The Director explained that he subsequently informed Fuke that the Department "would honor" the May 22, 2000 recognition of six lots. Accordingly, Pruglo's subdivision application was based on recognizing six pre-existing lots. The Director also acknowledged that "there was a mistake in the approval" of the subdivision application because the Planning Department had not accounted for the non-contiguous lot:

> As Mr. Kellberg correctly points out, there was a mistake in the approval of that subdivision. One of the six recognized lots was a 0.699 acre portion of Grant 11,070. For some reason, it was not contiguous with the remainder of TMK No. 3–2–2–35. In the consolidation/resubdivision, the Planning Department did not notice that this noncontiguous portion had been included in the lot count. Thus, it remained separate, and is now TMK No. 3–2–2–110. Thus, with the six lots in Sub. 05–00064 and parcel 110, there are now seven lots instead of six.

(Emphases added). The Director then stated that he would not be taking any action to "undo this situation at this time" because the subdivision had already "received final subdivision approval and at least some of the lots have been sold":

> I am not going to do anything to undo this situation at this time. Sub. 05–0064 has received final subdivision approval and at least some of the lots have been sold. Given that parcel 110 is physically separated from the remainder of Sub. 05–00064, and from any property owned by the subdivider, I cannot see a way to erase its separate existence.

The Director concluded his letter by apologizing for not responding earlier and informing Kellberg that the Planning Department staff had been "instructed to send copies of future correspondence from our office con-

---

3. On August 12, 2009, Fuke submitted a revised application for Subdivision 06–000333, to consolidate the non-contiguous parcel (TMK 3–2–02:110) with another lot created by Subdivision 05–00064 (TMK 3–2–02:68). On October 21, 2009, Fuke submitted a final plat map to the Planning Director. Although the final approval of Subdivision 06–000333 is not included in the record on appeal, according to a Planning De-

partment employee, the non-contiguous parcel was "consolidated with an adjoining property."

4. Kellberg's June 19, 2006 letter is not included in the record on appeal. However, the letter is referenced throughout the record, and the Planning Director acknowledged receiving the letter.

cerning Sub. 06–000333 and any revisions of Sub. 05–00064."

In a letter dated February 6, 2007, Kellberg responded to the Director. Kellberg stated that he had reviewed the revised final plat map referenced in the Director's January 19, 2007 letter, and the "major defect" regarding the non-contiguous lot remained. Kellberg continued, "[A]nd so I thought I would avail myself of the opportunity to ask you to reconsider your stated position that you are 'not going to do anything to undo this situation at this time.'" Kellberg cited § 23–74(c) of the Hawai'i County Code (County Code),[5] providing that the Director's "approval for recordation of the final plat by the director shall not relieve the subdivider of the responsibility for any error in the dimensions or other discrepancies. Such errors or discrepancies shall be revised or corrected, upon request, to the satisfaction of the director." Kellberg wrote that it was his belief that this provision "would give you the legal power to require Mr. Fuke and Mr. Pruglo to correct the mistake, regardless of the cost or inconvenience to themselves."

Kellberg noted that Fuke and Pruglo still owned two pairs of abutting lots in the subdivision. Accordingly, it was within the Director's power "to resolve the original lot count 'mistake' by simply notifying Mr. Fuke and Mr. Pruglo that they are required to combine one or the other of these abutting pairs into a single lot, thereby reducing the total number created to the requisite six."

On June 15, 2007, the Planning Director wrote a letter briefly responding to Kellberg, which did not address the concerns raised by Kellberg.

### B. *Circuit Court Proceedings*

#### 1.

On May 11, 2007, Kellberg filed a Complaint in the circuit court against the County Defendants.[6] In Count I, Kellberg alleged that he is a "person aggrieved by the decision of [the Planning Director] to approve SUB–05–00064." He further alleged that the Planning Director had continually refused to revise the subdivision approval to comply with Chapter 23 of the County Code, despite the Director's acknowledgment that there was a mistake in the approval of the seven-lot subdivision. The Director had also refused to require Pruglo to comply with the law.

In Count II, Kellberg alleged that he was entitled to a declaratory judgment regarding "the application of the [County Code] to SUB–05–00064 and [the Planning Director's] arbitrary decision to disregard the limitations of Section 23–67 and to create seven (7) lots out of one in violation of Section 23–7 [ (governing pre-existing lots) ]."

Under Count III, Kellberg claimed that as an adjacent landowner, he has a property interest in the subdivision. He stated that the County Defendants approved the subdivision "without correcting patent defects" and without providing any notice or due process to him. He alleged that the subdivision approval therefore violated his right to due process under the Fifth and Fourteenth Amendments to the U.S. Constitution and article I, section 5 of the Hawai'i Constitution.

In Count IV, Kellberg alleged that the Planning Director abused his discretion and violated statutes by refusing to apply County Codes § 23–67, requiring tentative approval of the preliminary plat map to be deemed void without timely submission of a final map, and § 23–74(c), requiring errors in subdivisions to be revised or corrected to the director's satisfaction.

In Count V, Kellberg alleged that he was entitled to an injunction requiring the Planning Director to bring the subdivision into compliance with the County Code and prohibiting the County Defendants "from permitting more than two (2) lots on the Subject Property and from allowing any subdivision of the Subject Property other than in accordance with [the County Code]."

---

5. The 2005 edition of the County Code, as amended by supplements through 2012, is available at http://www.hawaiicounty.gov/lb-countycode/# countycode.

6. The Honorable Glenn S. Hara, presiding.

Finally, in Count VI, Kellberg claimed that his property had been adversely and materially impacted by the subdivision and by the County Defendants' refusal to correct the mistakes that had been made.[7]

### 2.

On January 9, 2008, the County filed a Motion to Dismiss the Complaint (First Motion to Dismiss). The County argued that the Complaint must be dismissed because Kellberg "has not alleged any concrete interest which gives rise to standing on his part to bring this suit."

Following a hearing on the motion, the court entered an order denying the County's First Motion to Dismiss on April 1, 2008. The court found that Kellberg, "as the owner of real property adjoining SUB–05–00064, has standing to assert the claims in the Complaint."

On July 23, 2008, the County Defendants filed a Motion to Dismiss for Failure to Exhaust Administrative Remedies (Second Motion to Dismiss).[8] The County Defendants noted that pursuant to County Code § 23–5, any person aggrieved by the Director's decision "may, within thirty days after the director's decision, appeal the decision to the board of appeals." The County Defendants argued that Kellberg was aware of the subdivision in August 2005, and "the Planning Director, in a letter dated October 23, 2006, refused to accede" to Kellberg's requests. The County Defendants argued that Kellberg had not appealed any decision of the Director to the BOA within the required thirty-day time frame. Accordingly, the circuit court lacked subject matter jurisdiction over the case because Kellberg had failed to exhaust all available administrative remedies.

Kellberg responded that the circuit court has original jurisdiction over the Complaint, which alleged violations of the state and federal Constitution and violations of statutes. Kellberg argued that even if the court found that the Planning Department or BOA has unique expertise regarding any issues raised in the Complaint, the doctrine of primary jurisdiction required the action to be stayed rather than dismissed.

A hearing on the Second Motion to Dismiss was held on September 5, 2008. In response to the court's questions regarding notice of the subdivision to Kellberg, counsel for the County Defendants argued that the Planning Director's October 23, 2006 letter "says this was a final decision and nothing else could have occurred." Thus it was the County Defendants' position that Kellberg had until November 23, 2006 to file an appeal.

However, the court responded that the letter was "somewhat ambiguous or at least confusing" because the Chairman appeared to be saying that the final subdivision approval was on July 11, 2005, and Kellberg should have filed an appeal by August 11, 2005, which was well before the Chairman's letter.

On September 30, 2008, the circuit court entered its findings of fact, conclusions of law and order denying the Second Motion to Dismiss. The court found "the County has not shown that there were administrative processes available to Mr. Kellberg providing meaningful and adequate notice of SUB 05–00064 and an opportunity to appeal the Planning Director's decision."

7. Based on the foregoing, Kellberg requested that the court provide the following relief: 1) declare the subdivision violative of the County Code and therefore void; 2) declare the Planning Director's conduct in approving the subdivision illegal and void as against public policy; 3) determine that Kellberg should be provided with notice and an opportunity to be heard on the merits of the subdivision approval; 4) find that the Planning Director's refusal to correct mistakes in the subdivision approval constitutes an abuse of discretion and direct the Planning Director to take necessary action to bring the subdivision approval in compliance with the County Code; 5) issue a mandatory injunction requiring the Planning Director to correct the subdivision and enjoining the County Defendants from approving further subdivision of the Subject Property until it is brought into compliance with the County Code; 6) award Kellberg monetary damages as proven at trial; 7) award Kellberg attorneys' fees and costs; and 8) grant Kellberg such other relief as is just and proper.

8. The Second Motion to Dismiss also sought dismissal based on the failure to join indispensable parties.

The court concluded that it had "original jurisdiction of Plaintiff's Complaint which, under the circumstances, is not subject to dismissal for failure to exhaust administrative remedies." The court further concluded that Kellberg "did not fail to exhaust available administrative remedies and, instead, the Court finds that, under the circumstances presented on the motion, Plaintiff did not have an available administrative remedy."

On May 27, 2009, Kellberg filed a "Motion for Partial Summary Judgment on Count I (Violation of Statute), Count II (Declaratory Judgment) and Count IV (Abuse of Discretion)" (Motion for Partial Summary Judgment). Kellberg argued that there was no genuine issue of material fact that the County Defendants had violated the County Code by approving the subdivision, which "yielded seven (7) lots out of six (6)[.]" Additionally, Kellberg claimed that the Planning Director, who acknowledged the "mistake" in his subdivision approval, was required to correct the mistake.

In response, the County Defendants argued that the "determinations of pre-existing lots as well as the approval of the number of lots in a consolidation and re-subdivision are determinations within the discretion of the Planning Director."

On May 29, 2009, the County Defendants filed a "Motion to Dismiss Pursuant to Rule 12(b)(6) of the Hawaii Rules of Civil Procedure" (Third Motion to Dismiss). The County Defendants argued that no private cause of action exists to permit Kellberg to challenge the Planning Director's actions regarding the County Code.

On June 19, 2009, a hearing was held on Kellberg's Motion for Partial Summary Judgment. The court explained that it was "inclined to ... flesh out the record at the County level" by granting Kellberg's Motion for Partial Summary Judgment "in the form of an order remanding this back down to the County for a appeal before the Board of Appeals." The court further explained that

it was finding that "Kellberg was denied an appeal before the Board of Appeals based on the October 23, 2006, decision of the director," but stopping short of finding a specific violation of the subdivision approval and "leaving that up to the Board of Appeals." The court stated that it was "sending it back to the Board of Appeals to process" Kellberg's "[a]ppeal of the October 23 decision."

On July 24, 2009, the court filed its order granting the Motion for Partial Summary Judgment. The order provided, "IT IS ORDERED ADJUDGED AND DECREED that Plaintiff should have been allowed to appeal the decision of October 23, 2006 pursuant to the provisions of Section 23–5 of the Hawaii County Code but Plaintiff was denied such an opportunity to appeal." The order continued, "The Court remands this case to the Board of Appeals for the County of Hawaii regarding the Appeal of the Decision of the Director found in the October 23, 2006 letter to Mr. Kellberg."

On the same day, the court entered its order denying the County Defendants' Third Motion to Dismiss, reaffirming that Plaintiff, as the owner of real property adjoining SUB–05–00064, has standing to assert the claims in the Complaint."

### C. Board of Appeals Proceedings

On September 15, 2009, Kellberg filed a "General Petition for Appeal of Decisions by Planning Director" (Petition) with the Board of Appeals.[9] In his Petition, Kellberg stated that he sought "reversal, modification, or remand" of "three major decisions" of the Planning Director, "to whatever extent is necessary" to satisfy the County Code: 1) the January 12, 2005 decision to honor the May 22, 2000 determination that the Subject Property contained six pre-existing lots; 2) the July 11, 2005 decision to grant final subdivision approval; and 3) the October 23, 2006 letter stating that the Director would do nothing to bring the subdivision into compliance.[10]

---

9. The Petition was attached as Exhibit B to Kellberg's declaration, which was attached to Kellberg's March 4, 2010 motion for partial summary judgment on Count V and for an injunction against the County.

10. Kellberg appears to have prepared and submitted the Petition without the assistance of counsel.

On October 21, 2009, the County Defendants filed a motion to dismiss the Petition.

The BOA held a hearing to consider the Petition and the motion to dismiss on November 13, 2009. Counsel for the County Defendants argued that "[a]ny ruling by Judge Hara ... cannot confer additional jurisdiction to the Board" and that Judge Hara "made no determination" that the BOA "should accept jurisdiction[.]" Counsel also argued that if the BOA took "October of 2006 as the date of the decision ... then any appeal would have had to been filed no later than ... November 22, 2006."

Kellberg and his counsel questioned "what decisions are included in that October 2006 letter." Kellberg's counsel further argued that whether the October letter could be characterized "as a final decision that in the ordinary course might be appealable" was not relevant to the BOA's decision on the Petition.

The BOA voted 5–1 to grant the motion to dismiss the Petition. On February 19, 2010, the BOA filed its findings of fact, conclusions of law, and decision and order (Decision and Order). The BOA found that Kellberg was appealing "from a written decision of the Planning Director dated October 23, 2006 ... informing Appellant that the Planning Department would take no further action on a complaint by Appellant regarding consolidation and re-subdivision application SUB 05–000084." The BOA found that Kellberg "filed an appeal from the Director's Decision on September 15, 2009."

The BOA further found that Kellberg "received notice of the requirements regarding the time for filing a notice of appeal to the [BOA] on March 5, 2006 prior to the October 23, 2006 letter from the Planning Director."

The BOA concluded that Kellberg's appeal was filed "beyond the time permitted to file an appeal," and the BOA therefore lacked jurisdiction to consider the appeal. Accordingly, the BOA determined that Kellberg's appeal was "dismissed and the decision of the Planning Director ... affirmed."

### D. *Circuit Court Proceedings Continued*

#### 1.

On March 4, 2010, Kellberg filed a "Motion for Partial Summary Judgment on Count V (Injunction) and for Injunction against the County of Hawaii" (Motion for Injunction) with the circuit court. Kellberg requested an order granting summary judgment on Count V of the Complaint, seeking an injunction remanding the case to the Planning Department with instructions to the Planning Director to bring the subdivision into compliance with the County Code, and enjoining the County Defendants from "allowing the further sale, transfer of ownership, or development and improvement of lots created" by the subdivision until compliance is demonstrated.

Kellberg argued that he had fully complied with the circuit court's July 24, 2009 order granting the Motion for Partial Summary Judgment, but was "deliberately and effectively prevented" by the County Defendants "from obtaining the relief intended by the Court." Kellberg argued that the BOA's treatment of his appeal demonstrated that Kellberg "never had, nor would have ever been allowed to have, an administrative remedy with regard to any aspect of SUB 05–00064."

The County Defendants argued in response that the BOA rendered its final decision in its Decision and Order filed on February 22, 2010, but Kellberg did not file an appeal from this Decision and Order. Thus the BOA's findings "are final and have a preclusive effect upon the issues concerning the exhaustion of administrative remedies and the jurisdiction of the circuit court with respect to this case."

A hearing on the Motion for Injunction was held on April 28, 2010. At the hearing, counsel for the County Defendants argued that "the problem" with the case was that although the circuit court "remanded" the case to the BOA, the case "never came up from the board of appeals." The court responded, "[D]idn't [the BOA] finally dismiss the appeal on the same grounds that I found that Mr. Kellberg had a basis to go ahead and have an appeal, and that is—the timing

of all of these matters did not allow him to adequately lodge an appeal with the board?" The court clarified that it had remanded the case to the BOA to "see what kind of remedies they had if they were, in fact, convinced that the subdivision laws, as I was convinced, was not complied with."

The court concluded that it was "inclined to go ahead and grant the motion," but also stated that the court was "reluctant" because "the issue of whether or not there may be adequate remedies at law in terms of damages would preclude the granting of a motion for summary judgment."

Nearly five months later, on September 22, 2010, the circuit court filed an order denying the Motion for Injunction. The order provided that the court's July 24, 2009 order remanding the matter to the BOA rendered Count V of the Complaint "moot as the remand addressed Mr. Kellberg['s] right and opportunity to be heard referred to in Count V."

On October 15, 2010, the circuit court filed a second order denying the Motion for Injunction. The order was largely identical to the initial order. The second order additionally provided that Kellberg's "failure to exhaust his administrative remedies forecloses this court from further action in this matter."

#### 2.

On April 21, 2011, the County Defendants filed a "Motion for Summary Judgment" (Motion for Summary Judgment) on all claims, asking the court to dismiss the Complaint.

In relevant part, the County Defendants argued that Kellberg had failed to exhaust his administrative remedies. Pursuant to County Code § 23-5, Kellberg "had thirty days to appeal the Planning Director's decision to recognize six pre-existing lots or

11. The Honorable Ronald Ibarra, presiding.

12. Kellberg appealed the circuit court's 1) July 24, 2009 order granting Motion for Partial Summary Judgment; 2) September 22, 2010 order denying Motion for Injunction; 3) October 15, 2010 order denying Motion for Injunction; 4) June 14, 2011 order denying Motion for Supplemental Injunctive Relief; 5) June 16, 2011 order denying Motion to Enforce Judgment; 6) June

grant final subdivision approval." "However, Plaintiff failed to file an appeal with the BOA until the Court ordered him to do so."

On May 3, 2011, Kellberg filed a memorandum in opposition to the Motion for Summary Judgment. Kellberg noted that the circuit court had already determined in its September 30, 2008 order denying the Second Motion to Dismiss, that the County had not shown there were administrative processes available to Kellberg that provided notice and an opportunity to appeal the subdivision approval. Accordingly, Kellberg argued that the Motion for Summary Judgment should be denied as an untimely motion for reconsideration.

A hearing on the Motion for Summary Judgment was held on May 11, 2011.[11] On June 16, 2011, the court filed an order granting the Motion for Summary Judgment as to all counts. The order provided only that "the record reflects the absence of any genuine issue of material fact."

On February 28, 2012, the court filed a Final Judgment in favor of the County Defendants and against Kellberg on all counts of the Complaint.

#### E. *Appeal*

##### 1.

On April 4, 2012, Kellberg filed an appeal with the ICA, appealing the Final Judgment, as well as eight of the circuit court's prior orders.[12]

In his opening brief, Kellberg raised eight points of error. In relevant part, Kellberg argued that the circuit court erred in granting summary judgment based on a finding that Kellberg failed to exhaust his administrative remedies by not timely appealing the Planning Director's July 11, 2005 approval of the subdivision.

16, 2011 order granting Motion for Summary Judgment; 7) August 31, 2011 order granting in part and denying in part Motion to Vacate; 8) January 23, 2012 order denying Motion for Clarification; and 9) February 28, 2012 Final Judgment.

All eight orders were referenced in the circuit court's Final Judgment.

Kellberg stated that under the doctrine of exhaustion of remedies, an aggrieved party may apply directly to the court for relief if no administrative procedures are provided for the party to seek a remedy. In this case, Kellberg argued that no administrative remedies were available to him, as reflected in the circuit court's order denying the County Defendants' Second Motion to Dismiss. In that order, the court concluded that Kellberg "did not fail to exhaust administrative remedies and, instead, the Court finds that, under the circumstances presented on the motion, Plaintiff did not have an available administrative remedy."

Kellberg also argued that he had no available administrative remedy because he received no notice (whether "actual, constructive, or by way of visible developmental activity") of the subdivision application or approval. Rather, he first learned of the subdivision on August 11, 2005, a day after the thirty-day period of appeal had expired. Kellberg maintained that where a litigant fails to exhaust remedies because the litigant was not appropriately notified of its availability in time to use the remedy, then failure to exhaust is excused. He was therefore entitled to seek direct judicial review of his Complaint.

Kellberg further argued that the Planning Director's October 23, 2006 letter did not inform him that he had a right to appeal the Director's decision to do nothing about the mistakes in the approval. He argued, "Having been rebuffed by the BOA ..., no reasonable person would have understood [the Planning Director's] decision to do nothing as a separately appealable decision." Accordingly, Kellberg exhausted every potential avenue of administrative remedy before filing his Complaint.

With respect to his exhaustion of remedies following the BOA's dismissal of his Petition, Kellberg argued that the doctrine of exhaustion of remedies is not absolute, and provides for exceptions when no effective remedies exist. He complied with the court's July 24, 2009 order granting the Motion for Partial Summary Judgment by filing his Petition with the BOA, but the BOA and the County Defendants acted in defiance of the court order by refusing to review the subdivision. Thus, "[t]he BOA's February 19, 2010 dismissal of Kellberg's appeal definitively demonstrated the further pursuit of an administrative remedy to the dispute to be futile."

### 2.

The County Defendants argued in their answering brief that Kellberg failed to timely file an appeal with the BOA, and when the County Defendants "raised this jurisdictional issue," the circuit court "ordered this case to the BOA." Subsequently, the "BOA conducted an evidentiary hearing" and "ruled against Kellberg." However, Kellberg "failed to appeal the decision of the BOA," thereby "deliberately fail[ing] to exhaust his administrative remedies." The County Defendants argued that this decision by Kellberg to not appeal the BOA's decision precluded the circuit court from granting any further relief, as reflected in the circuit court's October 15, 2010 order denying the Motion for Injunction.

### 3.

The ICA concluded in its Memorandum Opinion that "Kellberg failed to exhaust the administrative remedies available to him before commencing his action, leaving the circuit court without jurisdiction to act on his complaint." *Kellberg v. Yuen,* No. CAAP–12-0000266, 129 Hawai'i 451, 2013 WL 3156015, at *3 (Haw.App. June 20, 2013) (Memo. Op.).

Pursuant to Part 8 of the BOA Rules and § 23–5 of the County Code, persons aggrieved by a decision of the Planning Director have thirty days to appeal the decision to the BOA. *Id.* The ICA stated that "[t]he time limit for the taking of an appeal established by statute is mandatory and if not complied with, the appeal must be dismissed." *Id.*

The ICA determined that "Kellberg did not file a petition for an appeal until the circuit court issued its July 24, 2009 order 'remanding' the case to the BOA." *Id.* at *3. According to the ICA, the circuit court's decision to deny the County Defendants' Second Motion to Dismiss for failure to exhaust

administrative remedies was based "on the March 2006 communications between Kellberg and the BOA." *Id.* The ICA disagreed with the circuit court's interpretation of the BOA's letter as foreclosing Kellberg's right to appeal. *Id.* at *3–4. Instead, the ICA stated, "The BOA's letter addressed Kellberg's right to appeal the July 11, 2005 subdivision approval only; it did not preclude or otherwise address Kellberg's right to appeal any other decision of the Planning Director." *Id.* at *4.

The ICA found that "[t]he Planning Director's October 23, 2006 letter, in which he refused to reconsider the subdivision approval despite the error, constituted an appealable decision from which Kellberg should have appealed to the BOA" but "he failed to pursue the available administrative procedures by appealing to the BOA within the time limit." *Id.*

Based on the foregoing, the ICA held that the circuit court should have dismissed Kellberg's action for lack of subject matter jurisdiction. *Id.* The ICA vacated the circuit court's Final Judgment and remanded the case for an order of dismissal. *Id.* The ICA's Judgment on Appeal was filed on July 19, 2013.

### F. *Application*

#### 1.

On September 17, 2013, Kellberg timely filed his Application to this court.[13] Kellberg raises the following questions presented for review:

1. Final Decision. Does the Director's letter conceding that 15 months earlier he erroneously approved a subdivision, but which states "I am not going to do anything to undo this situation at this time," constitute a new final decision that must be appealed to the BOA, and which supplants the existing right to judicial review of the original final decision approving the subdivision?

2. Due Process Notice. If the Director's letter was a new final decision supplanting the original final subdivision decision that must have been appealed to the BOA within 30 days in order to preserve the right to judicial review, did the Director have a due process obligation to give Kellberg notice?

Kellberg maintains that under the exhaustion of administrative remedies doctrine, the administrative review process "must be apparent, straightforward, and understandable to the people required to utilize it." Kellberg argues that the ICA committed two grave errors in this regard.

#### a.

"*First*, the BOA has jurisdiction to review only 'final decisions' by the Director, and by definition there can be only a single 'final' decision approving a subdivision application that can be appealed to the BOA." In this case, the "final decision" was the Director's approval of the subdivision in 2005. Kellberg thus maintains that any subsequent decisions made by the Planning Director did not have to be appealed to the BOA.

Kellberg argues that the ICA erroneously held that he was required to have appealed from the Director's October 2006 letter, which was written fifteen months after the final subdivision approval. Accordingly, the ICA effectively concluded that the letter, and not the Director's July 2005 subdivision approval, was the "true final decision on the matter," or alternatively that there can be more than one "final decision."

Kellberg contends that the "ICA's conclusion rests on the erroneous foundation that *all* decisions of the Director must be appealed to the BOA." The ICA thus erroneously held that the BOA Rules allow for appeals of "any" decision of the Director in the administration of the zoning and subdivision chapters of the County Code.

Additionally, Kellberg argues that the Director's 2005 approval of the subdivision was "final" under the plain meaning of the word, as it was "the last step in the process of approving subdivisions, and nothing remained for the Director to do." By contrast, the Director's 2006 letter was not "final" "because it left open the possibility of future action ('I am not going to do anything to

---

13. Kellberg's motion for extension of time was filed and granted on August 7, 2013.

undo this situation *at this time*').'" More-over, the letter was not a "decision" regarding the subdivision but "simply a statement 15 months after the fact that the Director was going to do nothing."

Kellberg concludes that the ICA's decision creates a situation of "administrative chaos," "in which every decision made by the Director potentially must be reviewed by the BOA within 30 days, and no final decision can ever be understood to be truly final because a later decision, even a decision to do nothing must be appealed."

### b.

With respect to the second issue, Kellberg argues that even if the October 2006 letter was a new "final" decision requiring Kellberg to appeal anew to the BOA, "the Director had a due process obligation to inform Kellberg of his right to appeal this new decision," particularly in light of the Planning Department and the BOA previously informing him that no appeal was possible.

Kellberg contends that the BOA's thirty-day time limit for appeals is mandatory, exclusive, and short. When a statute or rule provides for such shortened appeals periods, Kellberg argues that the due process clauses of the state and federal Constitution require an agency to give express and conspicuous notice of the time period and of avenues for redress.

Kellberg notes that the Director's letter only acknowledged that a mistake had been made and did not mention the BOA appeals process or the thirty-day limitations period. There was also no notice in the letter that the letter constituted a "final decision."

In addition, Kellberg argues that the property interest jeopardized by the Director's lack of notice is "constitutionally significant," and the burden on the Director to inform recipients that a letter represents a "final decision" that they must appeal to the BOA within thirty days is "comparatively small." Kellberg notes in this regard that the City and County of Honolulu includes "clear and conspicuous notice" that its letters must be appealed to the Zoning Board of Appeals.

Kellberg thus concludes that assuming the Director's October 2006 letter was the exclusive means for him to challenge the 2005 subdivision approval, the Director nevertheless failed his due process duty to inform Kellberg. Accordingly, "the letter did not affect Kellberg's right to institute a lawsuit to invalidate the subdivision approval."

Consequently, Kellberg requests that this court "reverse the ICA's opinion and judgment, and remand the case [to the ICA] for consideration of the remaining issues raised by Kellberg's appeal."

### 2.

The County Defendants respond by maintaining that Kellberg failed to file an appeal "of the Planning Director's decision to recognize six pre-existing lots or grant final subdivision approval." Kellberg also failed to appeal the BOA's decision to dismiss the appeal following the circuit court's order.

Additionally, the County Defendants argue that the Director's October 23, 2006 letter "clearly stated no further action would be taken" and thus constituted a final appealable order under the BOA Rules.

## II. STANDARD OF REVIEW

■ The existence of jurisdiction is a question of law that we review de novo under the right/wrong standard. Questions regarding subject matter jurisdiction may be raised at any stage of a cause of action. When reviewing a case where the circuit court lacked subject matter jurisdiction, the appellate court retains jurisdiction, not on the merits, but for the purpose of correcting the error in jurisdiction. A judgment rendered by a circuit court without subject matter jurisdiction is void.

*Lingle v. Haw. Gov't Emps. Ass'n,* 107 Hawai'i 178, 182, 111 P.3d 587, 591 (2005) (quoting *Amantiad v. Odum,* 90 Hawai'i 152, 158–59, 977 P.2d 160, 166–67 (1999)).

## III. DISCUSSION

### A.

The first issue raised by Kellberg in his Application is whether the Planning Di-

rector's October 23, 2006 letter constituted a final decision that was required to be appealed to the BOA.

### 1.

■ "Courts have developed two principal doctrines to enable the question of timing of requests for judicial intervention in the administrative process to be answered: (1) primary jurisdiction; and (2) exhaustion of administrative remedies." *Kona Old Hawaiian Trails Grp. v. Lyman,* 69 Haw. 81, 92–93, 734 P.2d 161, 168 (1987) (quotation marks and brackets omitted). "These principles are doctrines of comity designed to outline the relationship between courts and administrative agencies and secure their proper spheres of authority." *Leone v. Cnty. of Maui,* 128 Hawai'i 183, 192, 284 P.3d 956, 965 (App.2012). *Pacific Lightnet, Inc. v. Time Warner Telecom, Inc.,* 131 Hawai'i 257, 272, 318 P.3d 97, 112, 2013 WL 6669334, at *13 (Haw. Dec. 18, 2013) ("under the doctrine of primary jurisdiction, the court and the agency share concurrent jurisdiction over the matter").

■ The doctrine of exhaustion of administrative remedies provides that "where a claim is cognizable in the first instance by an administrative agency alone," "[j]udicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process." *Kona Old,* 69 Haw. at 93, 734 P.2d at 169 (quotation marks and citations omitted). "As such, the doctrine of exhaustion of remedies *temporarily* divests a court of jurisdiction." *Williams v. Aona,* 121 Hawai'i 1, 9, 210 P.3d 501, 509 (2009).

■ In contrast, the doctrine of primary jurisdiction "applies where a claim is <u>originally cognizable in the courts,</u> and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Kona Old,* 69 Haw. at 93, 734 P.2d at 168 (quotation marks, ellipses and brackets omitted) (emphasis added). "When this happens, the judicial process is suspended pending referral of such issues to the administra-tive body for its views," and the courts are effectively "divested of whatever original jurisdiction they would otherwise possess." *Id.* at 93, 734 P.2d at 168–69 (quotation marks omitted).

In this case, the ICA held that the County Code and BOA Rules "expressly provide an administrative process for resolving Kellberg's claims challenging the Planning Director's decision to grant the subdivision approval." 2013 WL 3156015, at *3. The ICA then applied the doctrine of exhaustion of administrative remedies and held that the circuit court should have dismissed Kellberg's action for lack of subject matter jurisdiction because Kellberg "failed to pursue the available administrative procedures by appealing to the BOA within" thirty days of "receiv[ing] an appealable decision in the form of the Planning Director's October 23, 2006 letter." *Id.* at *4.

### a.

The basic premise of the ICA's decision is that the Planning Director's October 23, 2006 letter constituted an appealable "decision" within the meaning of County Code § 23–5 and BOA Rules Part 8.

■ "When interpreting [county charters], municipal ordinances, and administrative rules, the general principles of statutory construction apply." *Hoku Lele, LLC v. City & Cnty. of Honolulu,* 129 Hawai'i 164, 167, 296 P.3d 1072, 1075 (App.2013). In statutory construction, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." *Paul v. Dep't of Transp.,* 115 Hawai'i 416, 426, 168 P.3d 546, 556 (2007) (quoting *Gray v. Admin. Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997)).

■ In this case, both the County Code and the BOA Rules §§ 8–2 and 8–3 provide that an aggrieved person may appeal "the decision" of the Planning Director to the BOA within thirty days after the decision. County Code § 23–5 (2005) provides that "[a]ny person aggrieved by <u>the decision</u> of the [planning director of the County] in the

administration or application of this chapter, may, within thirty days after the director's decision, appeal the decision to the board of appeals." [14] (Emphasis added). Similarly, the BOA Rules provide that "[a]ny person aggrieved by the decision of the Director in the administration or application of the Zoning, [and] Subdivision ... chapters of the Code ... may appeal the decision to the Board," [15] § 8–2 (emphasis added), so long as the appeal is "filed within thirty days after the decision." [16] § 8–3.

Neither the County Code nor the BOA Rules defines the phrase "the decision." However, the County Charter, which establishes the BOA and its jurisdiction,[17] specifies that the BOA "shall: (a) Hear and determine appeals from final decisions of the planning director or the director of public works regarding matters within their respective jurisdictions." [18] § 6–9.2 (2010) (emphasis added). "[A]n ordinance must conform to, be subordinate to, not conflict with, and not exceed the charter[.]" *Fasi v. City Council of City & Cnty. of Honolulu,* 72 Haw. 513, 518, 823 P.2d 742, 744 (1992) (quotation marks and citation omitted). Accordingly, the County Code and the BOA Rules must be interpreted in a manner consistent with the Charter.

The County Charter requires appeals to be taken from the Planning Director's "final decisions." The word "final" means "not to be altered or undone," "decisive" and "conclusive." *Webster's Third New Int'l Dictionary* 851 (1993) [hereinafter *Webster's*]. *See Black's Law Dictionary* 705 (9th ed. 2009)

[hereinafter *Black's Law*] (defining "final" to mean "not requiring any further judicial action by the court to determine the matter litigated; concluded").

Although the BOA Rules and the County Code do not use the term "final decision," the word "decision" alone also connotes finality. "Decision" is defined to mean "the act of deciding; *specif:* the act of settling or terminating," "a determination arrived at after consideration," "the quality of being decided," and "the act of forming an opinion or of deciding upon a course of action." *Webster's, supra* at 585. In the legal context, "decision" means "[a] judicial or agency determination after consideration of the facts and the law; esp., a ruling, order, or judgment pronounced by a court when considering or disposing of a case." *Black's Law, supra* at 467.

Thus the word "decision," understood in its ordinary and popular meaning, connotes a state of being final, settled or complete, and therefore has the same essential meaning as the phrase "final decision." *See* HRS § 1–14 (2009) ("The words of a law are generally to be understood in their most known and usual signification, without attending so much to the literal and strictly grammatical construction of the words as to their general or popular use or meaning."); *Saranillio v. Silva,* 78 Hawai'i 1, 10, 889 P.2d 685, 694 (1995) ("Under general principles of statutory construction, courts give words their ordinary meaning unless something in the statute requires a different interpretation.").

**14.** § 23–5 provides that upon appealing the director's decision to the BOA, the BOA may take the following actions:

The board of appeals may affirm the decision of the director, or it may reverse, modify or remand the decision if the decision is:

(a) In violation of this chapter or other applicable law; or

(b) Clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(c) Arbitrary, or capricious, or characterized by an abuse of discretion or clearly unwarranted exercise of discretion.

**15.** "Aggrieved person" is defined pursuant to County Code § 25–2–20 (2005). BOA Rules § 8–2. § 25–2–20 provides:

(b) A person is aggrieved by a decision of the director if:

(1) The person has an interest in the subject matter of the decision that is so directly and immediately affected, that the person's interest is clearly distinguishable from that of the general public; and

(2) The person is or will be adversely affected by the decision.

**16.** The BOA Rules are available at http://records.co.hawaii.hi.us/Weblink8/DocView.aspx?dbid=1&id=34351.

**17.** The BOA consists of seven members appointed by the mayor and confirmed by the County council. County Charter § 6–9.2.

**18.** The 2010 County Charter is available at http://hawaii.gov/elections/charters/charter—hawaii.pdf.

Accordingly, when reading the County Code and BOA Rules in concert with the County Charter, it is clear that only the Planning Director's "final decision" is appealable to the BOA. Given that a "final decision" settles a matter, it is implicit that there can only be a single "final decision" that may be appealed. Additionally, County Code § 23–5 and BOA Rules § 8–2 refer to "the decision" in the singular.

### b.

█ In this case, the subdivision challenged in Kellberg's Complaint [19] was approved pursuant to the Planning Director's July 11, 2005 letter to Fuke, which provided, "FINAL SUBDIVISION APPROVAL NO. SUB–05–000064." The letter stated, "Please be informed that final subdivision approval for recordation is hereby granted to the final plat map[.]" (Emphasis added). The Planning Director's decision to approve the subdivision was understood by all interested persons to settle the matter of the subdivision and to "decid[e] upon a course of action" with respect to the Subject Property. *Cf. Webster's, supra,* at 595.

Accordingly, Pruglo and Fuke acted in reliance on the Director's final approval, selling the first subdivision lot in October 2005, and thereafter submitting a second subdivision application in April 2006, which proposed consolidating lots that were created by the July 11 subdivision approval.

Furthermore, the County Code consistently treats the Director's final plat approval as the "final decision" on a subdivision application. For example, the final plat approval triggers the owner's ability to convey the land, to offer to sale, lease or rent any subdivision, and to enter into options or agreements for the purchase, sale, leasing or rental of the land. § 23–76 (2005) ("Land shall not be offered for sale, lease or rent in any subdivision, nor shall options or agreements for the purchase, sale, leasing or rental of the land be made until approval for recordation of the final plat is granted by the director.").

§ 23–75 (2005) provides that "[n]o change in a subdivision, or in the plan of a subdivision, already approved, may be made without the approval of the director." (Emphasis added).

The Code provides for the correction of "any error in the dimensions or other discrepancies" contained in the final plat, subsequent to final approval, but does not indicate that any corrections have the effect of nullifying the final approval. § 23–74(c) (2005) ("The approval for recordation of the final plat by the director shall not relieve the subdivider of the responsibility for any error in the dimensions or other discrepancies. Such errors or discrepancies shall be revised or corrected, upon request, to the satisfaction of the director."). In fact, in 2006, County Code § 23–73 was amended to provide: "The director's issuance of final subdivision approval shall be valid despite the absence of technical information as required by section 23–69(1) and (3), or the absence of similar technical but non-substantive information required by sections 23–69 and 70." County of Hawai'i, Haw., Ordinance No. 06–104 (Jul. 3, 2006), *available at* http://records.co.hawaii.hi.us/Weblink8/0/doc/30642/Page1.aspx.

Accordingly, although the subdivider in this case submitted a revised final plat map in December 2006, which was recertified on January 19, 2007, the County Defendants maintained that the revised map was "submitted to correct a deficiency" with respect to showing the location of existing dwellings and did not have the effect of "reevaluat[ing] the already-approved subdivision." [20] In accordance with its position, the County Defendants declared that "Final Subdivision Approval was previously issued July 11, 2005."

This position was further reflected in the BOA Chairman's March 21, 2006 letter to Kellberg, which stated, "According to our records, the Planning Director granted Final Subdivision Approval on July 11, 2005 for the 6–lot subdivision of the subject property." In the next sentence, the BOA Chairman wrote, "For your information, Section 8–3 [of

---

**19.** Kellberg alleged in his Complaint that he was a "person aggrieved by the decision of [the Planning Director] to approve SUB–05–00064."

**20.** County Code § 23–64 (Supp. 2006) provides that the preliminary plat shall include information on the "location of all existing structures," "unless waived or deferred by the director."

the BOA Rules] states that an appeal from the decision of the Planning Director shall be filed within thirty (30) days after the decision." Thus, the indisputable inference is that the Chairman considered the Director's final subdivision approval to be "the decision" referenced in § 8–3.

Under these circumstances, it is clear that the July 11, 2005 subdivision approval was the Director's final, appealable "decision" within the meaning of County Code § 23–5 and BOA Rules Part 8.

### c.

██ The ICA did not dispute that the Director's July 11, 2005 subdivision approval constituted an appealable decision. The ICA found that the BOA Chairman's March 2006 letter to Kellberg "addressed Kellberg's right to appeal the July 11, 2005 subdivision approval only[.]" 2013 WL 3156015, at *4. However, the ICA went on to find that the BOA's letter "did not preclude or otherwise address Kellberg's right to appeal any other decision of the Planning Director," and the Director's October 23, 2006 constituted a second appealable decision. *Id.* (emphasis added).

First, as noted, only the Planning Director's final decision is appealable pursuant to the County Code, BOA Rules, and County Charter. As Kellberg argues, if "any" decision of the Planning Director triggered an appeal to the BOA, then "administrative chaos" would result because "every decision made by the Director potentially must be reviewed by the BOA within thirty days, and no final decision can ever be understood to be truly final because a later decision, even a decision to do nothing must be appealed." Thus, the ICA erred in determining that Kellberg had a right to appeal "any other decision" of the Planning Director in addition to the acknowledged final subdivision approval.

Second, the Director's October 23, 2006 letter did not constitute a final decision. The letter was sent over a year after the final subdivision approval. In the letter, the Director explained what had occurred with the Planning Department's determination of pre-existing lots, and acknowledged, "As Mr. Kellberg correctly points out, there was a mistake in the approval of that subdivision." The Director then wrote, "I am not going to do anything to undo this situation at this time." The Director explained, "Sub. 05–00064 has received final subdivision approval and at least some of the lots have been sold. Given that parcel 110 is physically separated from the remainder of Sub. 05–00064, and from any property owned by the subdivider, I cannot see a way to erase its separate existence." The Director concluded the letter by informing Kellberg that any future correspondence from the Planning Department concerning "Sub. 06–000333 and any revisions of Sub. 05–00064" would be sent to him.

The Director's letter did not state that it constituted a final decision on the subdivision approval, or alternatively that it constituted a decision on a request for reconsideration of the subdivision approval. Contrary to the ICA's assertion, it was not "clear [that] the Planning Director's October 23, 2006 letter constituted an appealable decision." 2013 WL 3156015, at *4.

Notably, the ICA did not explain what aspects of the letter affirmatively made it "clear" that it constituted an appealable decision. The ICA's entire analysis consisted of demonstrating that the Director's letter was unlike the letters at issue in *Hoku Lele, LLC v. City & Cnty. of Honolulu*, 129 Hawai'i 164, 296 P.3d 1072 (App.2013),[21] in the sense that the Director did not "actively discourage[ ]" Kellberg from appealing or "suggest[ ] the planning director could take further action that would culminate in an appealable decision." 2013 WL 3156015, at *4.

---

**21.** In *Hoku Lele,* the plaintiff submitted a "zoning verification" request to the city's Department of Planning and Permitting, seeking confirmation of the legality of the plaintiff's property and certain buildings on the property. 129 Hawai'i at 165, 296 P.3d at 1073. The Department's director response "actively discouraged [the plain-

tiff] from appealing to the [Zoning Board of Appeals] by suggesting the director could take further action and could change his position regarding [the plaintiff's] right to retain Buildings C and D through a determination on a variance application." *Id.* at 165, 296 P.3d at 1077.

However, the fact that the Director did not "actively discourage" Kellberg from appealing does not lead to the conclusion that the Director's letter constituted a final, appealable decision.

Contrary to the ICA's conclusion, an examination of the Director's letter demonstrates that there is nothing in the letter to suggest that it constituted a separate appealable decision from the July 11, 2005 "final subdivision approval." The most conclusive statement in the Director's letter provides, "I am not going to do anything to undo this situation at this time." However, the Director went on to explain that he could not "undo" the situation because the subdivision had already "<u>received final subdivision approval</u> and at least some of the lots have been sold." (Emphasis added). Thus, rather than establishing a new decision, the Director's October 23, 2006 letter reinforced the finality of the Director's July 11, 2005 subdivision approval as the "final decision" on the subdivision.

The July 11, 2005 final subdivision approval therefore constituted the Director's final "decision" on the matter of the subdivision. The Director's October 23, 2006 letter did not have the effect of supplanting the final subdivision approval and did not constitute an appealable final "decision." The ICA thus erred by holding that Kellberg failed to exhaust available administrative procedures based on the ICA's determination that the Director's letter constituted an appealable decision.

2.

▋ Under County Code § 23–5 and BOA Rules § 8–2 and § 8–3, Kellberg was required to file an appeal with the BOA within thirty days of the Planning Director's final decision on July 11, 2005. Prior to filing his Complaint with the circuit court, Kellberg did not file such an appeal. As noted, generally the doctrine of exhaustion of remedies requires an aggrieved party to exhaust administrative remedies before seeking judicial review. *Kona Old*, 69 Haw. at 93, 734 P.2d at 169.

However, the "doctrine of exhaustion is not absolute." *Williams v. Aona*, 121 Hawaiʻi 1, 11, 210 P.3d 501, 511 (2009). *See generally* 2 Am.Jur.2d *Administrative Law* § 478 ("Failure to exhaust remedies is not an absolute bar to judicial consideration and must be applied in each case with an understanding of its purposes and of the particular administrative scheme involved.").

▋ This court has held that "'[a]n aggrieved party need not exhaust administrative remedies where no effective remedies exist." *Williams*, 121 Hawaiʻi at 11, 210 P.3d at 511 (quoting *Hokama v. Univ. of Haw.*, 92 Hawaiʻi 268, 273, 990 P.2d 1150, 1155 (1999)). Likewise, "[w]henever exhaustion of administrative remedies will be futile it is not required."[22] *Poe v. Haw. Labor Relations Bd.*, 97 Hawaiʻi 528, 536, 40 P.3d 930, 938 (2002) (quoting 4 Davis, *Administrative Law Treatise* § 26:11 (2d ed. 1983)) (quotation marks and brackets omitted).

▋ "Ordinarily, futility refers to the inability of an administrative process to provide the appropriate relief." *In re Doe Children*, 96 Hawaiʻi 272, 287 n. 20, 30 P.3d 878, 893 n. 20 (2001). *See e.g., Poe*, 97 Hawaiʻi at 536–37, 40 P.3d at 938–39 (individuals who sue employers for breach of a collective bargaining agreement need not exhaust remedies under that agreement "when pursuing the contractual remedy would be futile"); *Haw. Insurers Council v. Lingle*, 120 Hawaiʻi 51, 72, 201 P.3d 564, 585 (2008) (in suit challenging constitutionality of statute requiring payment of fees to insurance commissioner, commissioner would have been powerless to declare the fees imposed to be unconstitutional or to provide a refund on that basis).

It would appear self-evident that a party lacks an effective administrative remedy in a situation where the party is time-barred from appealing an administrative decision that the party was never appropriately made aware of until after the time for appeals had ended. If the party is not given notice that an appealable administrative decision was made in

---

22. "[T]he burden of proving that any particular administrative remedy is futile rests with the litigant seeking to bypass it." *In re Doe*, 96 Hawaiʻi 272, 287 n. 20, 30 P.3d 878, 893 n. 20 (2001).

the first instance, then even the most sophisticated party who is aware of the appeals process would be precluded from any opportunity to timely appeal the decision. *See* Michael Asimow, *Judicial Review: Standing and Timing*, 27 Judicial Review of Agency Action 269 (1997) ("Where a litigant failed to exhaust a remedy because he was not appropriately notified of its availability in time to use the remedy, the failure to exhaust is excused.").[23]

Washington courts have recognized the futility of an administrative appeal in such circumstances, holding that a party's failure to exhaust administrative remedies will be excused "if the aggrieved party has no notice of the initial administrative decision or no opportunity to exercise the administrative review procedures." *South Hollywood Hills Citizens Ass'n for Pres. of Neighborhood Safety & Env't v. King Cnty.*, 101 Wash.2d 68, 677 P.2d 114, 118 (1984) (en banc) (holding that county ordinance requiring publication of plat approval and posting of notices on property itself were constitutionally sufficient to notify adjacent property owners). *See Gardner v. Pierce Cnty. Bd. of Com'rs*, 27 Wash.App. 241, 617 P.2d 743, 745 (1980) (exhaustion rule inapplicable where "[d]efendants concede[d] that the County did not give notice of the negative declaration when it was issued . . . , and there is nothing in the record . . . to indicate that [the plaintiff] had notice of the declaration or an opportunity to challenge it[.]").

In this case, the subdivision application, submitted April 7, 2005, was approved by the Planning Director on July 11, 2005, through a letter sent directly from the Director to Fuke. At the time of the approval, the County Code did not require any notice to adjoining property owners of pending subdivision applications or final approval of applications.[24] Kellberg lacked knowledge of the subdivision application and approval until August 11, 2005, when he learned of the subdivision by chance, through observing a "for sale" sign on the Subject Property and being contacted by a realtor offering to sell him a subdivision lot. By that time, the thirty-day time period for appealing the Director's decision to the BOA had already passed the day before, on August 10, 2005. Under these circumstances, where Kellberg failed to timely appeal the Director's final subdivision approval because he had no opportunity to receive notice of the approval, the exhaustion doctrine should not be applied to preclude Kellberg's appeal.

Even if Kellberg had immediately filed an appeal with the BOA on August 11, 2005, when he first learned of the subdivision approval, his appeal would have been dismissed as untimely. This was confirmed by the BOA Chairman's March 21, 2006 letter, which was written in response to Kellberg's request for information regarding the BOA's appeals process. The Chairman wrote that final subdivision approval had already been granted on July 11, 2005 and that any appeal from the Director's decision must be filed within thirty days of the decision.

The County Defendants have not claimed that Kellberg had any way of knowing that the subdivision had been approved on July 11, 2005. The County Defendants have also not addressed what effect such lack of knowledge had on Kellberg's inability to exhaust administrative remedies. Instead, the County Defendants sought to avoid the issue of whether Kellberg received any notice of the

23. This report was prepared for the California Law Revision Commission, an independent state agency. Cal. Gov't Code § 8280. The commission publishes its annual reports, recommendations and studies in published bound volumes, available at http://www.clrc.ca.gov/Mreports-publications.html. Asimow's report to the Commission is available at http://clrc.ca.gov/pub/BKST/BKST-Asimow5.pdf.

24. Subsequently on September 18, 2005, the County passed an ordinance adding County Code § 23–58.1, requiring the subdivision applicant to post a sign on the subject property that would notify the public of the application and remain on the property until final approval, or until the application has been rejected or withdrawn. County of Hawai'i, Haw., Ordinance No. 05–135 (Sept. 18, 2005), *available at* http://records.co.hawaii.hi.us/Weblink8/0/doc/27823/Page1.aspx.

In 2006, the County amended the County Code to add § 23–58.2, requiring the director to publish, on a semi-monthly basis, a list of all subdivision applications. County of Hawai'i, Haw., Ordinance No. 06–104 (Jul. 3, 2006), *available at* http://records.co.hawaii.hi.us/Weblink8/0/doc/30642/Page1.aspx.

final subdivision approval by arguing that they considered the Director's October 23, 2006 letter to be the "final decision" from which Kellberg should have appealed.

However, as noted, the Director's October 2006 letter did not constitute an appealable decision. Accordingly, Kellberg was only able to appeal from the July 11, 2005 final subdivision approval, of which he had received no notice within the period allowed for an appeal. Because the County Code and the BOA Rules did not require any such notice, the law did not provide Kellberg with a meaningful opportunity to appeal the Planning Director's decisions. *See Pele Defense Fund v. Puna Geothermal Venture,* 9 Haw. App. 143, 151, 827 P.2d 1149, 1154 (1992) ("Where the administrative machinery is not provided, the power of the court is not ousted by a claim of failure to exhaust administrative remedies."). Thus, Kellberg's failure to timely appeal the final subdivision approval to the BOA is excused.

Furthermore, this court has held that the exhaustion doctrine may be excused when the policy interests underlying the doctrine, which involve interests of comity between courts and administrative agencies, are "outweighed by other interests." *Williams,* 121 Hawai'i at 11, 210 P.3d at 511. *See South Hollywood Hills Citizens Ass'n,* 677 P.2d at 118 ("Washington courts have recognized exceptions to the exhaustion requirement in circumstances in which these policies are outweighed by consideration of fairness or practicality."); *Lochsa Falls, L.L.C. v. State,* 147 Idaho 232, 207 P.3d 963, 968 (2009) (the court has recognized exception to exhaustion doctrine "when the interests of justice so require").

In this case, although the time for appeal had already passed by the time Kellberg learned of the final subdivision approval, Kellberg diligently made multiple efforts to correct what he believed to be serious errors and omissions in the subdivision approval. Kellberg immediately began attempting to contact the Planning Director after learning about the subdivision, visiting the Planning Department office the next day and leaving messages for the Director to contact him. When the Director failed to contact him as

requested, Kellberg wrote his first letter on August 16, 2006, detailing the errors he observed in the subdivision approval. Kellberg continued attempting to contact the Director to no avail, and wrote a second letter to the Director on January 17, 2006.

In February and March 2006, Kellberg contacted Corporation Counsel, the BOA, and the Mayor regarding his concerns about the subdivision approval. Corporation Counsel responded by suggesting that Kellberg simply continue attempting to contact the Director and consider appealing to the BOA, although the BOA subsequently informed him that the time for an appeal had already passed. On June 19, 2006, Kellberg wrote a third letter to the Director, and Kellberg's counsel wrote a fourth letter to the Director on Kellberg's behalf on August 25, 2006. Despite Kellberg's significant efforts, the first and only substantive response Kellberg received in regard to his concerns with the subdivision approval was the Director's October 23, 2006 letter.

■ Under these circumstances, it would be manifestly unfair to apply the exhaustion doctrine to dismiss Kellberg's Complaint simply because he failed to appeal the July 11, 2005 decision within thirty days. The doctrine of exhaustion is one of comity between the courts and the agencies. "Comity may be broadly defined as 'reciprocity,'" or the principle that courts will give effect to the decisions of agencies "out of deference and mutual respect." *Chun v. Bd. of Trs. of Emps.' Ret. Sys. of State of Haw.,* 92 Hawai'i 432, 446, 992 P.2d 127, 141 (2000) (quotation marks and citations omitted).

This case does not implicate any concerns of comity between the circuit court and the BOA, as the County Defendants' actions and the BOA's procedures had the effect of precluding Kellberg entirely from filing an appeal of the Director's final subdivision approval. Similarly, exercising jurisdiction over Kellberg's Complaint raises no concerns that it will encourage the "deliberate flouting of administrative processes," or infringe on "agency autonomy" by preventing the BOA from "apply[ing] its expertise ... and correct[ing] its own errors." *Andrade v. Lauer,* 729 F.2d 1475, 1484 (D.C.Cir.1984). On the

contrary, the circuit court expressly gave the BOA the opportunity to address the merits of Kellberg's claims and to correct any errors of the Planning Director with respect to the subdivision approval. Rather than taking the opportunity to apply its expertise, however, the BOA dismissed Kellberg's Petition for untimeliness.

■ The purpose of the exhaustion requirement is "to redirect grievances for their proper resolution, not to preclude them altogether." *Hokama,* 92 Hawai'i at 275, 990 P.2d at 1157. From the time Kellberg learned of the final subdivision approval, he was already precluded from an opportunity to appeal the approval to the BOA because he was not notified of the approval, and the applicable law at the time provided no mechanism for such notification. When the circuit court sought to provide Kellberg with an opportunity appeal to the BOA, the BOA dismissed his appeal as untimely. Based on the foregoing, it cannot be said that Kellberg had any meaningful administrative remedies left to exhaust before filing his Complaint.

If the exhaustion doctrine were strictly and mechanically applied in this case, then Kellberg would be left without a remedy, prevented from any opportunity to redirect his grievance for its proper resolution. Such a result would be plainly inequitable under the circumstances. *Cf. Hokama,* 92 Hawai'i at 275, 990 P.2d at 1157 (holding that twenty-day limitations period for filing grievances under contract "should not operate to automatically bar" the plaintiff's claims where the plaintiff's failure to exhaust administrative remedies was reasonable under the circumstances); *Painters Dist. Council No. 2. v. Tiger Stripers, Inc.,* 582 F.Supp. 860, 863 (E.D.Mo.1984) ("[t]o now hold [the claimant] to the time period specified in the contract for initiating the grievance procedure ... would neither be fair nor serve to further the purposes of the exhaustion requirement," where the claimant's belief that the administrative procedure "was neither mandatory nor available to it" was "not unreasonable").

Accordingly, Kellberg was not required to exhaust administrative remedies by appealing the Director's final subdivision approval to the BOA within thirty days of the decision.

The ICA therefore erred by holding that Kellberg's Complaint should have been dismissed for lack of subject matter jurisdiction based on the exhaustion doctrine.

### 3.

■ The County Defendants also argue that Kellberg "deliberately failed to exhaust his administrative remedies" because Kellberg did not appeal the BOA's decision to dismiss his Petition following the circuit court's remand to the BOA.

However, the circuit court's order granting Kellberg's Motion for Partial Summary Judgment remanded the case to the BOA specifically for the purpose of allowing Kellberg to appeal the Director's October 23, 2006 letter. The circuit court had explained during the hearing on the motion that it wanted to "flesh out the record at the County level," and that the court was "sending it back to the Board of Appeals to process" Kellberg's appeal. The court had also denied the County Defendants' Third Motion to Dismiss on the same day that it entered its order remanding the case to the BOA.

Kellberg complied with the court's order of remand by filing his Petition with the BOA. Nevertheless, the BOA dismissed the Petition based on Kellberg's failure to file an appeal with the BOA within thirty days of the Director's letter.

Consistent with the circuit court's order of remand, after the BOA's dismissal, Kellberg returned to the circuit court and filed the Motion for Injunction, requesting an order granting summary judgment on Count V of the Complaint and seeking an injunction remanding the case to the Planning Department with instructions to the Planning Director to bring the subdivision into compliance with the County Code.

At the hearing on the Motion for Injunction, the circuit court commented that the BOA dismissed the Petition for being untimely, even though the court had already held that "the timing of all of these matters did not allow [Kellberg] ... to adequately lodge an appeal with the board[.]" The circuit court again explained, "I was trying to give the county and the board of appeals the

opportunity [to provide remedies]." The court further stated that it was "inclined to go ahead and grant the motion[.]" However, five months later, the court filed orders denying the Motion for Injunction, determining that Count V of the Complaint was "moot" because the court's order remanding the case to the BOA "addressed Mr. Kellberg['s] right and opportunity to be heard referred to in Count V." The court concluded that Kellberg's "failure to exhaust his administrative remedies forecloses this court from further action in this matter."

It is unclear how Kellberg's actions could be interpreted as failing to exhaust administrative remedies when Kellberg complied with the court's order remanding the case to the BOA and the BOA undermined the purpose of the remand by dismissing his Petition as untimely. The circuit court's consideration of Kellberg's Complaint was still ongoing when the court remanded the case to the BOA by granting Kellberg's Motion for Partial Summary Judgment as to Counts I, II and IV of the six-count Complaint. As noted, the circuit court did not dismiss the case when it remanded the case to the BOA; rather, it denied the County Defendants' Third Motion to Dismiss. Thus it was clearly contemplated that the parties would return to the circuit court regardless of the outcome of the BOA appeal. It was therefore unnecessary for Kellberg to have filed a separate appeal of the BOA's dismissal.

Filing such an appeal would also have been contrary to the interests of judicial economy served by the exhaustion doctrine. *See Williams*, 121 Hawai'i at 9, 210 P.3d at 509 ("In general, the doctrine of exhaustion of remedies is a policy of judicial economy.").

▮▮▮ " 'The exhaustion principle asks simply that the avenues of relief nearest and simplest should be pursued first.' " *Kona Old*, 69 Haw. at 93, 734 P.2d at 169 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Burger, C.J., dissenting)) (ellipses omitted). In the context of this case, where the circuit court ordered the BOA to consider Kellberg's appeal, and the BOA acted contrary to the order, the "nearest and simplest" avenue of relief for Kellberg was to return to the

circuit court rather than filing an entirely new appeal. Accordingly, the lack of a new appeal did not constitute a failure to exhaust administrative remedies.

### B.

The second issue raised in Kellberg's Application asks whether, assuming that the Director's October 23, 2006 letter was an appealable final decision, the Director had a due process obligation to give Kellberg notice that the letter constituted such a decision.

As Kellberg notes, the court need not reach the second question because the Director's letter did not constitute an appealable final decision. However, it is noted that while the ICA did not address whether the Director's letter satisfied due process requirements, the ICA held that it was "clear" that the Director's letter constituted an appealable decision. 2013 WL 3156015, at *4.

In *Hoku Lele*, 129 Hawai'i 164, 296 P.3d 1072, the court held that the Zoning Board of Appeals lacked jurisdiction to review the planning director's letters responding to requests for zoning verification because the director lacked the ability to render "decisions" on such requests. *Id.* at 167–68, 296 P.3d at 1075–76. However, the court found that even assuming the board had jurisdiction to review the letters, "the procedure employed by the [city planning department] in this case creates a <u>substantial risk of permanently depriving [the plaintiff] of its ability to seek review either at the ZBA or in court.</u>" *Id.* at 168, 296 P.3d at 1076 (emphasis added).

In this regard, the *Hoku Lele* court noted that where the time for appeal was "mandatory, exclusive, and short," other jurisdictions had held that "due process required the government to provide affirmative notice" of the right to appeal. *Id.* The court then found that the director's letter in that case "included several paragraphs explaining the variance application process but failed to mention the ZBA" appeals process and actively discouraged the plaintiff from appealing to the ZBA by suggesting he could take further action and by suggesting a variance applica-

tion as a second option. *Id.* at 168–69, 296 P.3d at 1076–77.

Similarly, even if the Planning Director's October 2006 letter had constituted an appealable "decision," the ICA's finding that the letter was "clear" in this regard is problematic in two respects. First, it is unreasonable to expect the recipient of the Director's correspondence to know that any casual conclusion or observation ("I am not going to do anything to undo this situation at this time") may constitute a final appealable decision. Second, the difficulty of timely appealing to the BOA from such correspondence is compounded when considering that the time for appeals is relatively short; only thirty days from the time of the Director's decision. These challenges "create[ ] a substantial risk of permanently depriving" the recipient of his or her ability to seek timely review through the BOA. *Hoku Lele,* 129 Hawai'i at 168, 296 P.3d at 1076.

As noted by Kellberg, the burden on the Director to inform recipients that a letter represents a "final decision" that must be appealed to the BOA within thirty days is minimal when considering the interests of the recipients. For example, Kellberg argues that the City and County of Honolulu clearly states in its letters that the Planning Director has reached a decision, which may be appealed to the Zoning Board of Appeals within thirty calendar days.

▮▮▮ Providing notice that the Director's letter constitutes a final appealable decision is consistent with the exhaustion doctrine. In order for the doctrine to apply, "[t]he statute, ordinance or regulation under which the agency exercises its power must establish 'clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties.'" *Pele Defense Fund v. Puna Geothermal Venture,* 9 Haw.App. 143, 152, 827 P.2d 1149, 1154 (App.1992) (quoting *Rosenfield v. Malcolm,* 65 Cal.2d 559, 55 Cal.Rptr. 505, 421 P.2d 697, 701 (1967)) (emphasis added). *Cf. Haw. Blind Vendors Ass'n v. Dep't of Human Servs.,* 71 Haw. 367, 374, 791 P.2d 1261, 1265 (1990), *overruled on other grounds by Tamashiro v. Dep't of Human Servs.,* 112 Hawai'i 388, 146 P.3d 103 (2006) (holding that plaintiffs were not time

barred from requesting an agency hearing because the agency process was not "of such a nature as to impress fully upon the litigant the opportunity for recourse it supplies and the consequence of failure to seek such recourse").

If the goal of the exhaustion doctrine is to redirect grievances to their proper forum, then such a goal is not served by fostering uncertainty over the Director's decisions and the BOA's process for administrative review. Rather, claimants, agencies, and courts alike benefit when the process for agency review is clearly articulated so that claimants can fairly and efficiently resolve their disputes without resorting to the courts.

Similarly, providing such notice in the Planning Director's communications would also be consistent with basic principles of due process, which generally provide that the right to be heard is meaningless without being given the information necessary to exercise that right. *Cf. Brody v. Village of Port Chester,* 434 F.3d 121, 130–32 (2d Cir. 2005) (notice of condemnation procedures "sent to affected property owners must make some conspicuous mention of the commencement of the thirty-day review period to satisfy due process"); *Town of Randolph v. Estate of White,* 166 Vt. 280, 693 A.2d 694, 696 (1997) ("The right to be heard is worth little unless one is informed that the matter is pending and can choose 'whether to appear or default, acquiesce or contest.'") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 13, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (municipal utility's notice of termination of utility service was not reasonably calculated to inform customers of the availability of an opportunity to present their objections, where the "final notice" simply stated that payment was overdue and that service would be discontinued if payment was not made).

The record in this case demonstrates that the errors resulted from Kellberg's lack of notice as to the Director's final subdivision approval, and confusion over the nature of the Director's October 2006 letter. As noted, the County Code now includes mechanisms

for providing public notice of subdivision applications and final approval.[25] In order to prevent future misunderstandings over the significance and effect of the Director's statements and correspondence, it would be beneficial for the Planning Director to clearly indicate when an appealable "decision" has been made and how an interested person may challenge that decision. In addition to being consistent with the doctrine of exhaustion of remedies and the principles of due process, such efforts would impose only a minimal burden on the Director while having the significant benefit of promoting clarity in the review process. Such clarity would help to ensure that grievances are actually resolved through their proper forum rather than precluded due to lack of notice and confusion over the review process.

## IV. CONCLUSION

For the reasons set forth in this opinion, we vacate the ICA's July 19, 2013 Judgment on Appeal and remand the case to the ICA for consideration of the remaining issues raised by Kellberg in his appeal to the ICA.