**Electronically Filed
Supreme Court
SCAP-22-0000268
30-MAY-2024
07:51 AM
Dkt. 29 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

PUALANI KANAKA'OLE KANAHELE, EDWARD HALEALOHA AYAU,
KELI'I IOANE, JR., Petitioners/Plaintiffs-Appellants,

vs.

STATE OF HAWAI'I; DEPARTMENT OF TRANSPORTATION; EDWARD SNIFFEN,
in his official capacity as Director of the Department of
Transportation; DEPARTMENT OF LAND AND NATURAL RESOURCES; DAWN
N.S. CHANG, in her official capacity as Director of the
Department of Land and Natural Resources; DEPARTMENT OF HAWAIIAN
HOME LANDS; HAWAIIAN HOMES COMMISSION; KALI WATSON, in his
official capacity as Director of the Department of Hawaiian Home
Lands and Chair of the Hawaiian Homes Commission; PATRICIA A.
KAHANAMOKU-TERUYA, RANDY K. AWO, PAULINE N. NAMU'O, ZACHARY Z.
HELM, DENNIS L. NEVES, MICHAEL L. KALEIKINI, MAKAI FREITAS, in
their official capacities as members of the Hawaiian Homes
Commission, Respondents/Defendants-Appellees.

SCAP-22-0000268

MAY 30, 2024

RECKTENWALD, C.J., McKENNA, AND EDDINS, JJ., AND
CIRCUIT JUDGE CAHILL AND CIRCUIT JUDGE MALINAO,
ASSIGNED BY REASON OF VACANCIES

OPINION OF THE COURT BY McKENNA, J.

1

## I.    Introduction

This case concerns the Mauna Kea Access Road ("MKAR"),[1] which lies in part on Hawaiian home lands.

Plaintiffs Pualani Kanaka'ole Kanahele, Edward Halealoha Ayau, and Keali'i "Skippy" Ioane, Jr. (collectively "Plaintiffs") filed suit in the Circuit Court of the First Circuit ("circuit court") as Native Hawaiian[2] beneficiaries of the Hawaiian home lands trust who engage in native Hawaiian traditional and cultural practices on Maunakea.  Defendants are the State of Hawai'i ("State") and its Department of Transportation ("DOT"), Department of Land and Natural Resources ("DLNR"), Department of Hawaiian Home Lands ("DHHL"), and Hawaiian Homes Commission

---

[1]     The parties use both "Maunakea" and "Mauna Kea" in their filings.  "The University of Hawai'i at Hilo College of Hawaiian Language, Ka Haka 'Ula o Ke'elikōlani, recommends one word, 'Maunakea' as the proper Hawaiian usage." Meaning of Maunakea, University of Hawai'i at Hilo Center for Maunakea Stewardship, https://hilo.hawaii.edu/maunakea/culture/meaning#:~:text=Maunakea%20or%20Mauna a%20Kea%3F,as%20the%20proper%20Hawaiian%20usage [https://perma.cc/9P39-QEZ4]. The Center for Maunakea Stewardship, however, uses the "Mauna Kea" spelling where "Mauna Kea" is used in published or legal documents, such as the "Mauna Kea Science Reserve." Id.  Therefore, when referencing the mountain, the spelling of "Maunakea" is used.  When referencing the MKAR, the spelling of "Mauna Kea" is used.

[2]     For purposes of this opinion, "Native Hawaiian" means "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778" as defined by the Hawaiian homes Commission Act ("HHCA") § 201(a) (1920).  The use of  "native Hawaiian" encompasses all "descendants of the indigenous peoples who inhabited the Hawaiian Islands prior to 1778, regardless of blood quantum." Flores-Case 'Ohana v. Univ. of Hawai'i, 153 Hawai'i 76, 82 n.10, 526 P.3d 601, 607 n. 10 (2023).

("HHC"), as well as officials of those entities[3] (collectively "Defendants").

Plaintiffs allege Defendants breached their trust duties by allowing the State to use MKAR lands without payment since the 1970s. They also assert Defendants' attempt to make MKAR a state highway in 2018 was ineffective as a matter of law.

The circuit court[4] granted summary judgment in Defendants' favor based on Act 14 of 1995, which was to "[r]esolve all controversies relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988." 1995 Haw. Sess. Laws Act 14, § 2 at 698. To resolve such controversies, Act 14 proposed "compensation for all remaining confirmed

---

[3] Originally named were Jade Butay, as Director of Transportation; Suzanne Case, as Director of the DLNR; William Ailā Jr., as Director of DHHL and Chair of the HHC; and David B. Ka'apu as a member of the HHC. Hawai'i Rules of Civil Procedure Rule 25(d) (2000), however, titled "Public officers; death or separation from office," provides:

> When a public officer is a party to an action in an official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.

The names of the current public officials have therefore been substituted for those who no longer hold office. Now named are Edward Sniffen as Director of the DOT; Dawn N.S. Chang, as Director of the DLNR; Kali Watson, as Director of the DHHL and Chair of the HHC; and Pauline N. Namu'o, Zachary Z. Helm, Dennis L. Neves, Michael L. Kaleikini, and Makai Freitas, as members of the HHC.

[4] The Honorable Lisa W. Cataldo presided.

uncompensated public uses of Hawaiian home lands; [and] the initiation of a land exchange to remedy uncompensated use of Hawaiian home lands for state roads claims and highways[.]" 1995 Haw. Sess. Laws Act 14, § 6 at 700. Defendants argue Act 14 remedied the uncompensated use of the Hawaiian home lands underlying the MKAR and made enforcement of a land exchange the exclusive remedy for Plaintiffs.

Plaintiffs assert Act 14 of 1995 does not bar their claims because it only resolved claims that arose before July 1, 1988, and the State's attempt to designate MKAR a state highway occurred in 2018.

We granted Plaintiffs' application for transfer.

We hold (1) Act 14 of 1995 does not preclude Plaintiffs' claims; (2) the portion of the MKAR going through DHHL lands is not a state highway because legal requirements for such a designation were not satisfied; and (3) the State blatantly disregarded unambiguous requirements of the "Hawaiian Homes Commission Act, 1920" ("HHCA"), and in doing so, breached its constitutional and fiduciary obligation to faithfully carry out the HHCA. Haw. Const. art. XII, § 2; Ahuna v. Dep't of Hawaiian Home Lands, 64 Haw. 327, 338, 640 P.2d 1161, 1168 (1982). We therefore vacate the circuit court's March 16, 2022 final judgment and remand to the circuit court for further proceedings consistent with this opinion.

4

## II.  Background

### A.  Brief history of the Hawaiian Homes Commission Act

In 1921, Congress enacted the HHCA, which set aside about 203,500 acres of public lands as Hawaiian home lands for Native Hawaiians.  1995 Haw. Sess. Laws Act 14, § 1 at 696.  One of the principal purposes of the HHCA is to rehabilitate Native Hawaiians by establishing a permanent land base for their benefit and use.  HHCA § 101(b)(1); Ahuna, 64 Haw. at 336, 640 P.2d at 1167 (1982).  When Hawai'i became a state in 1959, the State entered a compact with the United States to assume the management and disposition of the Hawaiian home lands and to adopt the HHCA as a provision of the state constitution.  Haw. Const. art. XII, § 3; Ahuna, 64 Haw. at 337, 640 P.2d at 1168.  The constitution reads:

> The State and its people do hereby accept, as a compact with the United States, or as conditions or trust provisions imposed by the United States, relating to the management and disposition of the Hawaiian home lands. . . . The State and its people do further agree and declare that the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out.

Haw. Const. art. XII, § 2.  Hence, the State has a constitutional and fiduciary obligation to faithfully administer the HHCA for the benefit and rehabilitation of Native Hawaiians.  Id.; HHCA § 101(c); Ahuna, 64 Haw. at 338, 640 P.2d at 1168.  The DHHL is the state agency in charge of implementing the State's fiduciary duty under the HHCA.

In July of 1982, the United States Secretary of the Interior and the Governor of the State of Hawai'i established the Federal-State Task Force on the HHCA ("Federal-State Task Force"). In its August 1983 report, the Federal-State Task Force concluded the State had not met all of its fiduciary obligations and, furthermore, had "entered into conveyances and encumbrances of Hawaiian Home lands that have not been authorized by law." The Federal-State Task Force determined that since the inception of the HHCA, "large amounts of Hawaiian Home lands continue to be used for purposes which directly benefit the general public rather than beneficiaries" of the HHCA with little or no compensation being paid to DHHL. The Federal-State Task Force concluded the misuses to be breaches of trust "for which compensation is due and owing."

The Federal-State Task Force additionally pointed out that some Hawaiian home lands had been "taken for use as schools and other public purposes."[5] It deemed these takings unlawful and recommended that the Department of Interior and Department of Justice get involved if the DHHL was unable to resolve all unlawful takings and transfers of Hawaiian home lands matters.

This report did not mention the MKAR.

---

[5] As an example of an unlawful taking, 65 acres of Hawaiian home lands were used by the State Department of Education for Nānākuli High School. The record does not appear to explain whether or how this matter was resolved.

6

## B.    History of the MKAR

The HHCA stated the HHC would select suitable land from, among other places, the lands of Humu'ula Mauka in the district of North Hilo as available lands for the purposes of the HHCA. HHCA § 203(1).  In 1929, 49,100 acres of land in North Hilo were selected and designated as Hawaiian home lands.  Humu'ula Mauka is "the portion of Humuula [Humu'ula] above the Hilo Forest Reserve, a large area covering much of the saddle between Mauna Kea and Mauna Loa, reaching to the summit of the latter."[6]

In 1967, the legislature granted the University of Hawai'i $2,440,000 for, among other things, the "[p]lanning, construction and equipping" of a road for the Mauna Kea Observatory.  1967 Haw. Sess. Laws Act 217, § 1 at 292.  In 1970, the legislature appropriated an additional $2,123,000 to the DOT to construct "a two-lane highway from the Saddle Road in vicinity of Puu [Pu'u] Huluhulu to the summit by way of Hale Pohaku [Pōhaku]."  1970 Haw. Sess. Laws Act 187, § 1 at 413. The road, which became known as the MKAR, was partially built on 65.142 acres of Humu'ula Mauka land designated as Hawaiian home lands.

---

[6]    *Humuula Mauka*, Papakilo Database, https://www.papakilodatabase.com/main/documentdisplay.php?id=172219 [https://perma.cc/2PVD-6BFB].

From 1907 to 1976, it appears the Humuʻula Mauka Hawaiian home lands were managed by the DLNR and leased to Parker Ranch. In April of 1976, the DLNR returned management of the land to DHHL.

The County of Hawaiʻi apparently took over maintenance of the MKAR in 1974. In 1983, the County adopted a resolution accepting maintenance obligations for the MKAR.

## C.    Relevant legislation

In 1988, the legislature enacted Act 395, later codified in part as HRS chapter 673 (1988). 1988 Haw. Sess. Laws Act 395.

> Act 395 provided a limited waiver of sovereign immunity for beneficiaries of the trust to bring suits, prospectively, for money damages relating to breaches of the State's trust responsibilities occurring after July 1, 1988. 1988 Haw. Sess. L. Act 395, § 3 at 945. In addition, section 5 of Act 395 provided an unfettered right to sue for actual damages for past breaches of trust (*i.e.,* between August 21, 1959 and June 30, 1988) and directed that all suits must be brought prior to June 30, 1993. 1988 Haw. Sess. L. Act 395, § 5 at 945.

Kalima v. State, 111 Hawaiʻi 84, 88, 137 P.3d 990, 994 (2006).

With respect to pre-1988 breaches, Act 395 also allowed the governor to present a proposal to the legislature before the 1991 Regular Session to resolve Hawaiian home lands controversies that arose between August 21, 1959 and July 1, 1988. 1995 Haw. Sess. Laws Act 14, § 1 at 696. In 1991, the legislature accepted the governor's "Action Plan to Address Controversies under the Hawaiian Home Lands Trust and the Public Land Trust" ("Action Plan"). 1995 Haw. Sess. Laws Act 14, § 1

8

at 696.  The Action Plan included a recommendation to convene a task force of representatives from the DHHL, DLNR, Office of State Planning, and Department of the Attorney General ("AG") to accelerate the review and decision-making process concerning DHHL's land title and related compensation claims based on illegal, improper, or unauthorized withdrawals, takings, or uses of Hawaiian home lands.  The task force was to confirm title claims, determine which illegal or improper withdrawals or transfers were still in existence and should be cancelled or withdrawn, determine appropriate land exchanges, and determine appropriate compensation owed for past and continued uses of Hawaiian home lands.

The resulting Hawaiian home lands task force ("task force") was convened in 1991.

In 1992, the legislature provided $12,000,000 as compensation "for the State's uncompensated use of Hawaiian home lands since August 21, 1959."  1992 Haw. Sess. Laws Act 316, § 4 at 1011.  The money was intended to "resolve public use controversies."  1995 Haw. Sess. Laws Act 14, § 1 at 696.  Act 352 of 1993 extended the period within which to pay the compensation throughout fiscal year 1992 to 1993.  1993 Haw. Sess. Laws Act 352, § 4 at 996-97.

In accordance with HHCA § 204(a)(3), Act 352 of 1993 also authorized land exchanges to resolve controversies regarding

9

Hawaiian home lands that had been alienated from the trust. 1993 Haw. Sess. Laws Act 352, § 6 at 997. The legislature asserted "the State resolved all disputed set asides of Hawaiian home lands that remain in the control of the State." 1995 Haw. Sess. Laws Act 14, § 1 at 697.

The task force continued to verify and value certain unresolved claims. 1995 Haw. Sess. Laws Act 14, § 1 at 697. In both its 1995 final report and December 1, 1994 Memorandum of Understanding ("MOU"), the task force recommended compensation for all remaining confirmed uncompensated public uses of Hawaiian home lands, including a land exchange to remedy uncompensated use of DHHL lands for state roads and highways.

Then, in 1995, the state legislature enacted Act 14 ("the Act" or "Act 14") to resolve any claims remaining based on Act 395 of 1988's limited waiver of sovereign immunity. 1995 Haw. Sess. Laws Act 14. The Act established a trust fund ("trust" or "Hawaiian home lands trust") to provide funding for the DHHL and further the purposes of the HHCA. 1995 Haw. Sess. Laws Act 14, § 2 at 698. Act 14 was to "resolve all controversies relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988." 1995 Haw. Sess. Laws Act 14, § 2 at 698. The Act declared:

> The passage of this Act is in full satisfaction and resolution of all controversies at law and in equity, known or unknown, now existing or hereafter arising, established or inchoate, arising out of or in any way connected with

> the management, administration, supervision of the trust, or disposition by the State or any governmental agency of any lands or interests in land which are or were or are alleged to have been Hawaiian home lands, or to have been covered by the HHCA arising between August 21, 1959 and July 1, 1988.
>      The passage of this Act shall have the effect of res judicata as to all parties, claims, and issues which arise and defenses which have been at issue, or which could have been, or could in the future be, at issue, which arose between August 21, 1959 and July 1, 1988, whether brought against the State or its officials, directly or indirectly, by subrogation, derivative or third party action, tender, federal action, or by any other means whatsoever.

1995 Haw. Sess. Laws Act 14, § 4 at 699.

To resolve and satisfy all such controversies, Act 14 proposed "compensation for all remaining confirmed uncompensated public uses of Hawaiian home lands; [and] the initiation of a land exchange to remedy uncompensated use of Hawaiian home lands for state roads claims and highways[.]"  1995 Haw. Sess. Laws Act 14, § 6 at 700.

Regarding Act 395's waiver of immunity, Act 14 provided:

> With respect to all controversies arising between August 21, 1959 and July 1, 1988, excluding individual claims provided for pursuant to chapter 674, Hawai'i Revised Statutes, the State hereby affirms that the limited waiver of sovereign immunity permitted by Act 395, Session Laws of Hawai'i 1988, is now withdrawn and, to the extent the waiver was not previously withdrawn, it is now fully withdrawn. All claims arising between August 21, 1959 and July 1, 1988, or under any other law enacted in furtherance of the purposes or objectives of Act 395, Session Laws of Hawai'i 1988, except those permitted by chapter 674, Hawai'i Revised Statutes, are hereby forever barred.

1995 Sess. Laws Act 14, § 1 at 697 (emphasis added).

## D.    Designation of the MKAR as a state highway

With respect to the proposal to build a Thirty Meter Telescope ("TMT") at the summit of Maunakea, a hearing officer's

11

decision on the TMT conservation district use application was issued on September 26, 2017, and the first appeal from this decision, in which we ordered a remand to the BLNR for a contested case hearing, was filed on October 30, 2017. Matter of Conservation Dist. Use Application HA-3568, 143 Hawai'i 379, 387, 431 P.3d 752, 760 (2018).

In March 2018, Marshall Ando, then DOT Acting Highways Administrator, submitted an internal memorandum to Jade T. Butay, then Director of the DOT, requesting and recommending that the MKAR be designated a state highway. Ando's letter referred to the portion of the MKAR that runs from the intersection with Daniel K. Inouye Highway (also known as "Saddle Road") to 125 feet past the Visitor Information Center entrance (also known as "The Onizuka Center for International Astronomy Visitor Information Station" or "Visitor Station"). After the Visitor Station, the MKAR continues as the "Summit Access Road" to the summit of Maunakea. It is undisputed the Summit Access Road is located on land managed by DLNR.[7]

On March 27, 2018, Edwin Sniffin, Deputy Director of the DOT Highways Division, recommended acceptance of Ando's recommendation and Butay signed off on the recommendation,

---

[7] It does not appear the Summit Access Road is located on Hawaiian home lands as the parties agree that the MKAR begins at the intersection with Saddle Road and goes 125 feet past the Visitor Station.

12

purportedly designating the entire MKAR as state highway Route 210.

On October 30, 2018, this court affirmed the BLNR's decision on remand of September 27, 2017, authorizing issuance of a conservation district use permit for the TMT. Matter of Conservation Dist. Use Application HA-3568, 143 Hawai'i at 409, 431 P.3d at 782.

Thereafter, for multiple days in July 2019, opponents of the TMT gathered at the base of Maunakea and blocked access to the MKAR, thus preventing the construction of TMT on the summit of Maunakea.[8]  On the third day of protests, police arrested thirty-four protestors, including two of the individual plaintiffs in this case, Pualani Kanaka'ole Kanahele and Keli'i W. Ioane, Jr.  Id.

In apparent response to the protests and arrests, on August 30, 2019, the Department of the Attorney General, DHHL, and DOT issued a "Joint Statement on the Jurisdiction of Mauna Kea Access Road"[9] containing the following text:

> HONOLULU – The Department of the Attorney General (AG), Department of Hawaiian Home Lands (DHHL), and Department of

---

[8]     Ryan Prior & Chris Boyette, Protesters arrested at Hawaii's Mauna Kea for blocking construction of the Thirty-Meter Telescope, CNN (July 17, 2019, 11:47 PM), https://www.cnn.com/2019/07/17/us/mauna-kea-arrests-telescope-protests-trnd/index.html [https://perma.cc/L7DV-TFHG].

[9]     Joint Statement on the Jurisdiction of Mauna Kea Access Road, Department of Hawaiian Home Lands (Aug. 30, 2019), https://dhhl.hawaii.gov/2019/08/30/joint-statement-on-the-jurisdiction-of-mauna-kea-access-road/ [https://perma.cc/J4YS-7R7W].

13

> Transportation (DOT) issue this joint statement regarding Mauna Kea Access Road.
>
> Mauna Kea Access Road is under the control and jurisdiction of DOT.  Pursuant to HRS § 26-19 and HRS Ch. 264, DOT has control and jurisdiction over all state highways and Mauna Kea Access Road is designated to DOT's State Highway System as Route 210.  This includes any portions of the road that cross over DHHL land.
>
> "State DOT has controlled and maintained Mauna Kea Access Road since it became part of our highways system in 2018," said DOT Deputy Director Ed Sniffen.
>
> . . . .
>
> Beneficiaries of the Hawaiian Homes Commission Act of 1920 do not own Mauna Kea Access Road.  Act 14 (1995) resolved all claims concerning the use of Hawaiian home lands for public roads and highways built before and after statehood. In response to concerns that some compensation remains outstanding, DHHL and the Department of Land and Natural Resources (DLNR) have been working together to evaluate the terms of compensation and to confirm that it has been made in full.  This process, however, does not alter the fact that all claims regarding use of roads and highways crossing DHHL lands have been resolved.
>
> . . . .
>
> At this time, DOT has restricted access on Mauna Kea Access Road to preserve public health and safety, and to carry out its responsibilities under HRS Ch. 264.

## E.    Circuit court proceedings

### 1.    Complaint and answer

On February 13, 2020, Plaintiffs filed suit in circuit court, followed by a first amended complaint ("complaint"), seeking declaratory, injunctive, and monetary relief. Plaintiffs divide Defendants into two groups:  (1) the "DHHL Defendants," which include the DHHL, HHC, and the DHHL Director and Chair of HHC; and (2) the "State Defendants," which include the State, DOT, DOT Director, DLNR, and DLNR Chairperson.  The

14

complaint contains two counts: (1) DHHL Defendants' breach of trust; and (2) State Defendants' breach of trust.

Plaintiffs claim the DHHL Defendants breached their trust obligations by allowing the State Defendants to use the MKAR without payment. Plaintiffs allege the DHHL Defendants further breached their trust duty to make trust property productive (a) by failing to exercise such care and skill as a person of ordinary prudence would exercise in dealing with one's own property, including by allowing the State Defendants to exercise control over the MKAR; and (b) by failing to demand payment for the use of the lands under the MKAR after July 1, 1988.

Plaintiffs also contend the MKAR is neither a state nor a public highway because it was not properly designated as such pursuant to HRS §§ 264-1(a) (2022) and 264-43 (2020). Plaintiffs further allege the State Defendants breached their trust duties by designating the MKAR as part of the state highway system and using the trust lands without compensating the trust. Plaintiffs also assert the MKAR is still under the control of the DHHL Defendants as a matter of law. Plaintiffs claim the State Defendants' acts and omissions deprived the trust of revenue, and "Act 14 [did] not apply to this claim of liability against the State Defendants." Plaintiffs contend Act 14 does not apply to claims arising after July 1, 1988 regarding the uncompensated use of trust lands. They also maintain that

since the passage of Act 14 in 1995, the State has not compensated DHHL for the use of the MKAR nor has a land exchange been initiated.

Plaintiffs asked the circuit court to declare, inter alia, that Defendants breached their trust obligations and that the MKAR is not a state highway.  Plaintiffs also asked the circuit court to order the State Defendants to provide the DHHL Defendants fair compensation for their rent-free use of the MKAR and enjoin them from asserting authority over the MKAR.

Defendants, including the DHHL Defendants, filed an answer asserting that Plaintiffs' claims were barred, in whole or in part, by Act 395 and Act 14.  Defendants also claimed Plaintiffs lacked standing to assert any claims raised pursuant to HRS chapters 264 and 673 and the HHCA.

### 2.  Motion to dismiss

Defendants filed a motion to dismiss Plaintiffs' complaint ("motion to dismiss") arguing (1) the claims were barred by the State's sovereign immunity and Act 14 of 1995; and (2) Plaintiffs lacked a private cause of action to bring claims under HRS chapter 264.  Defendants asserted Act 14 of 1995 made the "land exchange to remedy uncompensated use of Hawaiian home lands for state roads claims and highways" the exclusive remedy for such claims.  1995 Haw. Sess. Laws Act 14, § 6 at 700. Defendants argued Act 14 barred the breach of trust claims

16

because Plaintiffs were not seeking to enforce the land exchange.

On May 29, 2020, the circuit court filed an order denying this motion.

### 3. Summary judgment

Plaintiffs then filed a motion for partial summary judgment ("MPSJ") on their breach of trust claims. On November 5, 2021, the circuit court filed an order denying this motion. On February 10, 2022, however, the circuit court filed an amended order and instead granted summary judgment to Defendants. The circuit court summarized the parties' positions:

> Plaintiffs argue that they may assert claims against Defendants pursuant to HRS ch. 673 for breach of trust and are entitled to the requested declaratory relief because (a) no land exchange as contemplated by Act 14 has occurred for the Hawaiian home lands underlying [the MKAR] and therefore, those lands remain in the Hawaiian home lands trust with the attendant trust obligations; and (b) Act 14 resolved claims relating to the Hawaiian home lands trust that arose between August 21, 1959 – July 1, 1988. . ., but the present controversy arose in March 2018 when the State designated MKAR as a State Highway.
> Defendants argue, among other things, that the State's sovereign immunity and Act 14 bar Plaintiffs' claims. As related to Act 14, Defendants maintain that the Act fully and finally resolved all claims related to the Hawaiian home lands identified in the Act, including the "uncompensated use of Hawaiian home lands for state roads claims and highways" (Opp., Ex. L at 700), and as such, to the extent that Plaintiffs assert any claim related to MKAR, the claim is limited to seeking enforcement of the land exchange described in Act 14.

The circuit court ruled Act 14 of 1995 was dispositive because it "fully and finally resolved" claims which arose between August 21, 1959 and July 1, 1988, involving the "uncompensated use of Hawaiian homelands for state roads claims

17

and highways." The circuit court quoted 1995 Haw. Sess. Laws Act 14, § 6 at 700. The circuit court reasoned that its conclusion was supported by language used throughout Act 14, but especially section 4,[10] as well as sections 1, 2, and 6.

The circuit court noted the legislature did not include a provision concerning the status of trust lands pending a land exchange. The circuit court concluded, however, that prohibiting suits against the State for claims and controversies related to Hawaiian home lands but allowing for "actions to enforce the provisions of this Act," was consistent with the legislature's intent to resolve all claims and controversies related to Hawaiian home lands upon the passage of Act 14. The circuit court quoted 1995 Haw. Sess. Laws Act 14, § 17 at 703.

---

[10] Section 4 provides in relevant part:

> The **passage of this Act is in full satisfaction and resolution of all controversies at law and in equity**, known or unknown, **now existing or hereafter arising**, established or inchoate, **arising out of or in any way connected** with the management, administration, supervision of the trust, **or disposition by the State or any governmental agency of any lands or interests in land which are or were or are alleged to have been Hawaiian home lands, or to have been covered by the HHCA arising between August 21, 1959 and July 1, 1988.**
> **The passage of this Act shall have the effect of res judicata as to all parties, claims, and issues** which arise and defenses which have been at issue, or which could have been, or **could in the future be, at issue, which arose between August 21, 1959 and July 1, 1988,** whether brought against the State or its officials, directly or indirectly, by subrogation, derivative or third party action, tender, federal action, or by any other means whatsoever.

1995 Haw. Sess. Laws Act 14, § 4 at 699 (emphases in court's order).

18

The circuit court also concluded that claims and controversies related to the "management, administration, . . . or disposition" of the trust lands underlying the MKAR arose before July 1, 1988.  The court noted that "[e]fforts to pave and improve MKAR began in the mid to late 1960s and continued through the early 1970s.  When completed in 1974, pursuant to an agreement with DHHL, the County maintained MKAR, and the public has used the road for more than 50 years."  The circuit court decided that because the trust had never been compensated for the use of the trust lands underlying the MKAR, it was therefore included in the land exchange contemplated by Act 14.  The court held that the contemplated land exchange resolved all controversies or claims regarding the trust lands underlying the MKAR that arose between August 21, 1959 and July 1, 1988, as well as all future claims related to the land.  The circuit court cited 1995 Haw. Sess. Laws Act 14, § 4 at 699.

The circuit court further concluded that the State's 2018 designation of the MKAR as a state highway did not give rise to any new claims, as any claims arose between August 21, 1959, and July 1, 1988.  The circuit court cited 1995 Haw. Sess. Laws Act 14, § 12 at 702.

19

On these grounds, the circuit court granted summary judgment in favor of Defendants.[11]  Final judgment was entered on March 16, 2022.

## F.  Appellate proceedings

Plaintiffs timely appealed, and we accepted transfer of the appeal.  On appeal, the parties generally reiterate their arguments in the circuit court.

Defendants additionally assert HRS § 264-42 (2020)[12] does not provide Plaintiffs with a private right of enforcement action, and even if it did, Plaintiffs lack standing to challenge the 2018 highway designation.

Defendants also assert Act 395 of 1988 preserves the State's sovereign immunity for "existing projects, programs, or any other governmental activities which are continuing, and which were begun, completed, or established prior to July 1, 1988."  Defendants cited 1988 Haw. Sess. Laws Act 395, § 4 at

---

[11]    The circuit court can enter summary judgment in favor of a nonmoving party.  Flint v. MacKenzie, 53 Haw. 672, 672, 501 P.2d 357, 357 (1972).  Relief can be granted notwithstanding the fact that the party has not filed a demand for such relief.  Id.  Furthermore, our appellate courts are likewise so empowered.  53 Haw. at 673, 501 P.2d at 358.

[12]    HRS § 264-42 "Authority to include other public highways in the state highway system" provides:

> The director of transportation acting in cooperation with appropriate federal and county agencies, may designate for inclusion in the state highway system, such other public highways, including county highways, which are used primarily for through traffic and not for access to any specific property, whether residential business, or other abutting property.

945. Defendants argue that even if Plaintiffs' claims did not arise before July 1, 1988, they relate to a government activity or project (the MKAR) that began before July 1, 1988 and continued thereafter.

Plaintiffs' reply brief asserts (1) Act 14 did not bar their claims that arose in 2018; (2) the ICA could rule on the State's violation of HRS chapter 264; and (3) Plaintiffs' claims are not precluded by sovereign immunity.

Plaintiffs argue their claims arose on March 15, 2018, when Defendants designated the MKAR a public highway and effectively removed the MKAR from the Hawaiian home lands trust. Plaintiffs claim the 2018 designation was a taking of trust lands because it removed maintenance and operation of the MKAR from the trust to the DOT, and therefore triggered new breaches of trust. They argue it was impossible for Act 14 to preclude claims that did not exist in 1988. Plaintiffs maintain their breach of trust claims are based on the taking of trust lands, which occurred when Defendants designated the MKAR as a state highway pursuant to HRS chapter 264.

Plaintiffs contend their claims are authorized by Act 395 because the 2018 designation changed the status quo by purporting to give Defendants jurisdiction over the MKAR; this new "activity" occurred after July 1, 1988, and therefore, sovereign immunity was waived.

Lastly, Plaintiffs argue that even if Act 395 did not waive sovereign immunity for damages, their remaining claims survive because the relief sought is prospective in nature. Plaintiffs argue equity principles allow them to protect trust assets to prevent ongoing breaches of trust.

### III. Standards of Review

**A. Summary judgment**

> "On appeal, the grant or denial of summary judgment is reviewed de novo." Furthermore,
>
>> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

Ralston v. Yim, 129 Hawai'i 46, 55-56, 292 P.3d 1276, 1285-86 (2013) (quoting First Ins. Co. of Hawai'i v. A&B Props. Inc., 126 Hawai'i 406, 413-14, 271 P.3d 1165, 1172-73 (2012)).

**B. Statutory interpretation**

> Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard.
>
> Our statutory construction is guided by the following well established principles:
>
>> [O]ur foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute

22

> itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.
>
> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.
>
> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.
>
> [The appellate] court may also consider the reason and spirit of the law, and the cause which induced the legislature to enact it to discover its true meaning.

Lingle v. Hawai'i Gov't Emp. Ass'n, AFSCME, Local 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005) (internal quotation marks, brackets, and ellipses omitted) (quoting Guth v. Freeland, 96 Hawai'i 147, 149-50, 28 P.3d 982, 984-85 (2001)).

## IV. Discussion

The circuit court did not address sovereign immunity other than the effect of Act 14 of 1995. The State, however, continues to raise sovereign immunity, standing, and exhaustion of administrative remedies as defenses. As any of them could bar Plaintiffs' claims, we address them first.

23

**A. Plaintiffs' claims are not barred by sovereign immunity, standing, and the exhaustion of administrative remedies doctrine**

**1. Sovereign immunity**

"It is well established that the State as sovereign is immune from suit except as it consents to be sued." Nelson, 130 Hawai'i at 168, 307 P.3d at 148 (quoting Figueroa v. State, 61 Haw. 369, 381, 604 P.2d 1198, 1205 (1979)). Even if sovereign immunity applies, prospective relief against a state official, can be pursued even if there may be "a substantial ancillary effect on the state's treasury"; if the relief sought is "tantamount to an award of damages for a past violation of law," however, it is barred by sovereign immunity unless sovereign immunity is waived by the State. Pele Def. Fund v. Paty, 73 Haw. 578, 609-10, 837 P.2d 1247, 1266 (1992) (citing Papasan v. Allain, 478 U.S. 265, 278 (1985)).

Thus, Plaintiffs' prospective claims against state officials are in any event not barred by sovereign immunity.

In addressing Plaintiffs' retrospective claims, we first address Act 395 of 1988, the Native Hawaiian Trusts Judicial Relief Act, codified in part as HRS chapter 673, which governs claims of mismanagement of Hawaiian home lands trust assets. Nelson, 130 Hawai'i at 170, 307 P.3d at 150. Plaintiffs' complaint asserts claims under HRS chapter 673. Compare Nelson, 130 Hawai'i at 171, 307 P.3d at 151 (holding the circuit court

24

would have lacked jurisdiction to hear claims alleging chapter 673 violations because Plaintiffs' claims were not brought under chapter 673 in their amended complaint).

Chapter 673 provides a waiver of the State's sovereign immunity from its effective date of July 1, 1988, as follows:

> (a) The State waives its immunity for any breach of trust or fiduciary duty resulting from the acts or omissions of its agents, officers and employees in the management and disposition of trust funds and resources of:
>     (1) The Hawaiian home lands trust under article XII, sections 1, 2, and 3 of the Constitution of the State of Hawaii [Hawai'i], implementing sections 4 and 5(f) of the Admission Act (Act of March 18, 1959, Public Law 86-3, 73 Stat. 4)[.]

1988 Haw. Sess. Laws Act 395 at 943; HRS § 673-1 (2016) (emphasis added).

Section 3 of Act 395 of 1988 specified that Act 395 did not apply to any cause of action which accrued, rights and duties that matured, penalties that were incurred, or proceedings that were begun, prior to July 1, 1988, its effective date.  1988 Haw. Sess. Laws Act 395 at 945.  Section 4 also indicated that sovereign immunity was not waived for causes of actions, projects, or other governmental activities that are continuing and were "begun, completed, or established prior to July 1, 1988."  1988 Haw. Sess. Laws Act 395 at 945.

Defendants argue Act 395 preserved the State's sovereign immunity for Plaintiffs' claims because they accrued when the public began using the MKAR in the 1970s.  Defendants assert

Plaintiffs' claims relate to a government activity (the MKAR) that began before July 1, 1988 and continue today.

Defendants' arguments lack merit because it was not until 2018 that designation of the MKAR as a state highway removed the Hawaiian home lands underlying the MKAR from trust control. This triggered new claims unrelated to the public use and mismanagement claims that Act 14 of 1995 purported to settle, discussed below. In allowing the DOT to take the MKAR, the State breached its fiduciary duty to faithfully administer the HHCA for the benefit of Native Hawaiians. HHCA § 101(c); Ahuna, 64 Haw. at 338, 640 P.2d at 1168. Defendants therefore waived sovereign immunity for the present suit. See 1988 Haw. Sess. Laws Act 395 at 943; HRS § 673-1.

Thus, even though the MKAR was constructed before July 1, 1988, at minimum, Plaintiffs can seek prospective declaratory and injunctive relief for the 2018 action.

## 2. Standing

HRS § 673-2 is titled "Right to sue," and it provides:

> (a) Native Hawaiians as defined in section [201(a)] of the Hawaiian Homes Commission Act, native Hawaiian organizations, the office of Hawaiian affairs, Hawaiians defined as any person who is qualified to succeed to a homestead lease under section 209 of the Hawaiian Homes Commission Act 1920, as amended, shall have the right to bring an action in the circuit courts of the State to resolve controversies relating to the Hawaiian home lands trust described in section 673-1(a)(1).

Plaintiffs have standing to bring this breach of trust action because all three individual plaintiffs are at least

26

fifty percent Native Hawaiian. 1988 Haw. Sess. Laws Act 395 at 943; HRS § 673-2. As defined by the HHCA, "Native Hawaiian" means "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." HHCA § 201(a). Additionally, Plaintiffs Kanahele and Ayau are the current lessees of their respective homesteads while Plaintiff Ioane has been on the homestead waitlist since 1980.

### 3. Exhaustion of administrative remedies

The exhaustion of administrative remedies defense also does not bar Plaintiffs' complaint. HRS § 673-3 provides:

> Before an action may be filed in circuit court under this chapter, the party filing suit shall have <u>exhausted all administrative remedies available</u>, and <u>shall have given not less than sixty days written notice prior to filing of the suit that unless appropriate remedial action is taken suit shall be filed.</u> All executive branch departments shall adopt in accordance with chapter 91, such rules as may be necessary to specify the procedures for exhausting any remedies available.

1988 Haw. Sess. Laws Act 395 at 943-44; HRS § 673-3 (emphases added). "A plain reading of the statute indicates that administrative remedies must be exhausted <u>and</u> written notification of not less than sixty days must be given." <u>Office of Hawaiian Affairs v. State of Hawai'i</u> ("<u>OHA</u>"), 110 Hawai'i 338, 359, 133 P.3d 767, 788 (2006) (emphasis in the original). If the two requirements are not fulfilled, the circuit and

27

appellate courts lack subject matter jurisdiction over the chapter 673 claims. Nelson, 130 Hawai'i at 171, 307 P.3d at 151.

In their memorandum in opposition to Plaintiffs' MPSJ, Defendants argued the circuit court lacked subject matter jurisdiction over Plaintiffs' claims because Plaintiffs did not exhaust their administrative remedies by requesting a contested case hearing before the HHC.

In response, Plaintiffs assert they exhausted all administrative remedies because they "issued an intent to sue letter more than 60 days prior to the filing of the Complaint." Additionally, Plaintiffs argued Hawai'i Administrative Rule ("HAR") § 10-5-31 (eff. 1981) does not require a contested case hearing.

HAR § 10-5-31, titled "Contested case hearing requests," provides:

> (a) Any person or agency including the commission and the department may request a contested case hearing and shall have the right and full opportunity to assert a claim provided that the claim is based on a law or rule over which the commission has jurisdiction.

(emphases added). In the above rule, the word "may" precedes the word "shall." See Ling v. Yokoyama, 91 Hawai'i 131, 133, 980 P.2d 1005, 1007 (Haw. App. 1999).

> In such a context, the Hawai'i Supreme Court has advised that "[w]here both mandatory and directory verbs are used in the same statute, especially where 'shall' and 'may' are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings."

Id. (citation omitted). As defined in Black's Law Dictionary (11th ed. 2019), "shall" means "[h]as a duty to; more broadly, is required to . . . [t]his is the mandatory sense[.]" In contrast, "may" is defined as "[t]o be permitted to . . . [t]o be a possibility." Id.

Plaintiffs assert that they could have, but were not required to request a contested case hearing. Had Plaintiffs done so, they would have been guaranteed the opportunity to assert their claims. HAR § 10-5-31.

Plaintiffs alternatively argue that it would have been futile to seek a contested case hearing. This court has held that "an aggrieved party need not exhaust administrative remedies where no effective remedies exist." Kellberg v. Yuen, 131 Hawai'i 513, 531, 319 P.3d 432, 450 (2014) (quoting Williams v. Aona, 121 Hawai'i 1, 11, 210 P.3d 501, 511 (2009)). Futility "refers to the inability of an administrative process to provide the appropriate relief." Id. (citing In re Doe Children, 96 Hawai'i 272, 287 n.20, 30 P.3d 878, 893 n.20 (2001)).

Here, requesting a contested case hearing would have been futile given the "Joint Statement on the Jurisdiction of Mauna Kea Access Road" that was released on August 30, 2019.[13] The

---

[13] Joint Statement on the Jurisdiction of Mauna Kea Access Road, Department of Hawaiian Home Lands (Aug. 30, 2019),

joint statement, which was issued by various agencies including the DHHL, stated the MKAR was under the control and jurisdiction of the DOT. Id. It is self-evident that Plaintiffs lacked an effective administrative remedy where the DHHL had already issued a public statement asserting the DOT now had jurisdiction over the MKAR. See Kellberg, 131 Hawai'i at 531, 319 P.3d at 450.

Hence, we need not decide whether Plaintiffs were required to request a contested case hearing because, as they correctly argue, such a request would have been futile.

HRS § 673-3 also contains a sixty-day-notice requirement. See OHA, 110 Hawai'i at 359, 133 P.3d at 788. Plaintiffs assert they served Defendants a notice to sue letter on or about September 7, 2019. Plaintiffs' letter was addressed to Jade Butay, then Director of DOT, members of the HHC, the AG's office, and the TMT International Observatory:

> Pursuant to HRS § 673-3, please consider this letter a sixty-day notice of intent to sue appropriate officials of the State Department of Transportation (DOT) and State Department of the Attorney General (DAG) for breaches of their trust duties under the HHCA and Haw. Const., Article XII, §§ 1, 2, and 3.
>
> . . . .
>
> Native Hawaiian beneficiaries, including Pualani Kanaka'ole Kanahele, Keli'i "Skippy" Ioane, Edward Halealoha Ayau . . . hereby seek corrective actions by the appropriate state officials, by immediately ceasing its above cited

---

https://dhhl.hawaii.gov/2019/08/30/joint-statement-on-the-jurisdiction-of-mauna-kea-access-road/ [https://perma.cc/J4YS-7R7W].

30

> activities and taking all required actions contemplated
> under Act 14 to compensate the HHCA trust before asserting
> jurisdiction and control over any of the 346 acres
> illegally taken from the trust for roads and highways.
>
> . . . .
>
> We, Native Hawaiian beneficiaries, Kanahele, Ioane,
> Ayau . . . will be asking for all allowable judicial
> remedies pursuant to HRS chapter 673, including reasonable
> attorneys' fees pursuant to HRS 673-5, if the
> aforementioned officials fail to initiate the appropriate
> corrective actions to address these trust breaches.

(Emphases added.)

Plaintiffs' letter unambiguously notified Defendants that suit would be filed in not less than sixty days "unless appropriate remedial action [was] taken." HRS § 673-3. Defendants admitted in their answer that Plaintiffs submitted the letter to them. Plaintiffs filed their amended complaint on February 20, 2020.

Plaintiffs therefore also met the statutory prerequisites for filing suit.[14]

**B.  Act 14 of 1995 also does not preclude Plaintiffs' claims**

The core issue then is whether Act 14 of 1995 precludes Plaintiffs' suit. We agree with Plaintiffs that, at minimum, the State's transfer of the portion of the MKAR at issue from the DHHL to the DOT is a new claim outside the scope of Act 14 of 1995. Additionally, we hold that the MKAR is not a state

---

[14]    The two-year statute of limitations begins when the cause of action accrues. HRS § 673-10. Plaintiffs' suit is timely because the DOT's taking of the MKAR occurred in March 2018, and Plaintiffs filed their complaint in February 2020.

highway because the State did not follow the proper process for removing Hawaiian home lands from the trust.

### 1. Act 14 of 1995

As noted above, Act 395 of 1988 waived sovereign immunity only for new claims arising after its July 1, 1988 effective date. The primary purposes of Act 14 of 1995 were to address claims before Act 395's effective date and to:

> (1) Resolve all controversies relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988;
> (2) Prohibit any and all future claims against the State resulting out of any controversy relating to the Hawaiian home lands trust which arose between August 21, 1959 and July 1, 1988;
> (3) Resolve all controversies after 1920 and prior to July 1, 1988 relating to the validity of patents issued and affecting any lands covered by or allegedly covered by HHCA and to all rights arising from or relating to such patents as issued;
> (4) Appropriate such funds and provide additional means as may be necessary to accomplish the intent and purpose of this Act;
> (5) Establish a trust fund to provide a substantial, secure, and predictable funding source for the department of Hawaiian home lands to use or to effectuate the purpose of the HHCA;
> (6) Further the public interest by ensuring that claims which have arisen or may arise in the future with respect to the administration of the Hawaiian home lands trust and are brought pursuant to chapters 673 and 674, [HRS], are resolved in a fair, complete, and timely manner.

1995 Haw. Sess. Laws Act 14, § 2 at 698 (emphases added). The legislature found that resolving such claims against the State was in the best interests of the State and the beneficiaries "due to the difficulty, time, uncertainty, disruption of public purposes, impact on the public land trust and private

32

landowners, and expense of judicial resolution of remaining disputed claims." 1995 Haw. Sess. Laws Act 14, § 1 at 697.

Also, section 4 of Act 14 provides in relevant part:

> The passage of this Act is in <u>full satisfaction and resolution of all controversies</u> at law and in equity, <u>known or unknown, now existing or hereafter arising</u>, established or inchoate, <u>arising out of or in any way connected with the management, administration, supervision of the trust, or disposition by the State or any governmental agency of any lands or interests in land</u> which are or were or are alleged to have been <u>Hawaiian home lands</u>, or to have been covered by the HHCA arising between August 21, 1959 and July 1, 1988.
> The passage of this Act shall have the effect of <u>res judicata</u> as to all <u>parties, claims, and issues which arise and defenses which have been at issue, or which could have been, or could in the future, be at issue, which arose between August 21, 1959 and July 1, 1988,</u> whether brought against the State or its officials, directly or indirectly, by subrogation, derivative or third party action, tender, federal action, or by any other means whatsoever.

1995 Haw. Sess. Laws Act 14, § 4 at 699 (emphases added).

Section 6 provides Act 14 would resolve and satisfy all controversies and claims encompassed by the Act through:

> (2) The transfer of lands and resolution of claims in the Waimanalo, Anahola, Kamalomalo, and Moloaa areas; <u>the compensation for all remaining confirmed uncompensated public uses of Hawaiian home lands; the initiation of a land exchange to remedy uncompensated use of Hawaiian home lands for state roads claims and highway.</u>

1995 Haw. Sess. Laws Act 14, § 6 at 700 (emphasis added).

Subsection (2) of section 6 is salient. Plaintiffs assert Act 14 does not preclude their claims because it only addressed breaches of trust occurring <u>between August 21, 1959 and July 1, 1988</u>. Plaintiffs allege breaches of trust that occurred in <u>2018</u> when the MKAR was designated a state highway, and the DOT assumed exclusive control and jurisdiction of the MKAR.

33

The parties agree the MKAR was built in 1964 and the public has used the road since construction was completed in the 1970s. It is further undisputed that the land exchange under Act 14 that was to provide compensation for public use of the MKAR until 1988 has not been completed. According to Defendants, "[a]s of 2019, completion of parts of Act 14's land transfer and exchange requirements remained outstanding, including compensation of approximately 346.203 acres to satisfy the [A]ct's roads and highways land exchange requirement."

Thus, Act 14 has not actually resolved the uncompensated public use of the MKAR from 1959-1988. The State has failed to remedy issues concerning the MKAR.[15] And even if Act 14's land exchange could preclude claims based on use of the MKAR until 1988, Plaintiffs can still sue to enforce the provisions of Act 14:

> Notwithstanding any other law to the contrary, the State and its officials, the members of the board, the members of the Commission and the independent representative shall not be subject to any suit by any party on any decision relating to the resolution of these claims, except for actions to enforce the provisions of this Act.

1995 Sess. Laws Act 14, § 17 at 703 (emphasis added).

---

[15] In 2021, the House passed a resolution which requested "the establishment of a working group to assess the status of Act 14." H.R. 76, S.D. 2, 31st Leg., Reg. Sess. (2021). The resolution noted it was unknown whether all state land claims under the HHCA had been settled pursuant to Act 14. Id. The legislature also emphasized its concern about "[t]he outstanding status of certain elements such as the Mauna Kea Access Road." Id. The resolution requested the working group submit a report prior to the convening of the Regular Session of 2022. Id. As of January 2024, no report has been submitted.

34

Plaintiffs have made it clear, however, that they are not seeking to enforce a land exchange.

Although Plaintiffs appeared to have been asserting claims arising out of the uncompensated use of the MKAR before 1988, their recent filings clarify that their claims arise out of the 2018 designation of the MKAR as a state highway.  We agree with Plaintiffs that Act 14 is in any event inapplicable to their claims arising out of the 2018 transfer because they do not arise out of the "uncompensated use" of the MKAR that Act 14 allegedly settled.  Plaintiffs appropriately assert "Act 14 could not have resolved [their] claims to fix the taking . . . and control over trust lands because that was not at issue in 1988."

## 2.   Failure to comply with the HHCA

In addition, Plaintiffs' breach of trust claims arising out of the 2018 designation are not barred because of the State's failure to comply with the HHCA.

Pursuant to the HHCA, lands that are designated as Hawaiian home lands are under the control of the DHHL and must be used and disposed of in accordance with the HHCA.  HHCA § 204(a) (emphasis added).  The DHHL is the only agency allowed to remove such land from the Hawaiian home lands trust via a land exchange or sale.  See HHCA §§ 204(a)(3) and 205.  Lands designated as Hawaiian home lands may be "sold or leased . . . [i]n the manner

35

and for the purposes set out in" the HHCA.  HHCA § 205.

Alternatively, if a land exchange is initiated, the Secretary of

the Interior must approve the transaction.  HHCA § 204.

> § 204.  Control by department of "available lands," return
> to board of land and natural resources, when; other lands,
> use of.  (a) Upon the passage of this Act, all available
> lands shall immediately assume the status of Hawaiian home
> lands and be under the control of the department to be used
> and disposed of in accordance with the provisions of this
> Act[.]
>
> . . . .
>
> (3)   The department, with the approval of the
> Secretary of the Interior, in order to consolidate its
> holdings or to better effectuate the purposes of this Act,
> may exchange the title to available lands for land,
> privately or publicly owned, of an equal value.

HHCA § 204(a) and (a)(3) (emphases added).

A land exchange is

> any transaction, other than a sale, that transfers Hawaiian
> home lands from the Hawaiian Home Lands Trust to another
> entity and in which the Hawaiian Home Lands Trust receives
> the entity's land as Hawaiian home lands.  A land exchange
> can involve trading Hawaiian home lands for private land,
> but it can also involve trading land between the Hawaiian
> Home Lands Trust and State or Federal agencies.

43 C.F.R. § 47.10 (eff. 2016) (emphasis added).  When an

exchange is proposed, the Chair of the HHC must submit to the

Secretary multiple documents, including a "summary of all

consultations with beneficiaries."  43 C.F.R. § 47.60.

> Consultation or consult means representatives of the
> government engaging in an open discussion process that
> allows interested parties to address potential issues,
> changes, or actions. Consultation does not necessarily
> require formal face-to-face meetings.  The complexity of
> the matter along with the potential effects that the matter
> may have on the Trust or beneficiaries will dictate the
> appropriate process for consultation.  Consultation
> requires dialogue (oral, electronic, or printed) or a good
> faith dialogue or documented effort to engage with the
> beneficiaries, consideration of their views, and, where

36

> feasible, seek agreement with the beneficiaries when engaged in the land exchange process.

43 C.F.R. § 47.10 (emphases added).  The Secretary will approve land exchanges that advance the interests of the beneficiaries.  43 C.F.R. § 47.20 (eff. 2016).

From 1907 to 1976, it appears Humuʻula Hawaiian home lands were under DLNR management and leased to Parker Ranch.  In April 1976, the DLNR returned management of Humuʻula to DHHL.  The County of Hawaiʻi took over maintenance of the MKAR in 1974 and again in 1983.  Pursuant to HHCA § 220(a), "roads through or over Hawaiian home lands, . . . shall be maintained by the county in which the particular road or roads to be maintained are located."  Until 2018, the DHHL maintained control and jurisdiction over the MKAR while the County of Hawaiʻi undertook maintenance responsibilities.  See HHCA § 220(a).

However, the DHHL's control and jurisdiction over the MKAR was abruptly ended in 2018 when the DOT designated the MKAR a state highway.  The "Joint Statement on the Jurisdiction of Mauna Kea Access Road" issued in 2019 by the Department of the AG, DHHL, and DOT stated the DOT, not the DHHL, controlled the MKAR:

> Mauna Kea Access Road is under the control and jurisdiction of DOT.  Pursuant to HRS § 26-19 and HRS Ch. 264, DOT has control and jurisdiction over all state highways and Mauna Kea Access Road is designated to DOT's State Highway System as Route 210.  This includes any portions of the road that cross over DHHL land.

"State DOT has controlled and maintained Mauna Kea Access Road since it became part of our highways system in 2018," said DOT Deputy Director Ed Sniffen.  "Prior to that time, sections of the road situated on Hawaiian home lands were maintained by the County of Hawai'i [Hawai'i] pursuant to a Memorandum of Agreement (MOA) between DHHL and the County of Hawai'i [Hawai'i]."

Beneficiaries of the Hawaiian Homes Commission Act of 1920 do not own Mauna Kea Access Road.  Act 14 (1995) resolved all claims concerning the use of Hawaiian home lands for public roads and highways built before and after statehood.

In response to concerns that some compensation remains outstanding, DHHL and the [DLNR] have been working together to evaluate the terms of compensation and to confirm that it has been made in full.  This process, however, does not alter the fact that all claims regarding use of roads and highways crossing DHHL lands has been resolved.

"Act 14 was a historic piece of legislation," said Hawaiian Homes Commission Chair William J. Aila [Ailā] Jr.  "It resolved long-standing claims associated with the use of Hawaiian home lands.  We remain committed to seeing the completion of the few remaining items under Act 14, including ensuring that compensation for the use of roads and highways crossing DHHL lands has been received in full."

"The State is reviewing the compensation issues related to the use of Hawaiian home lands for public roads and highways, and will ensure they have been addressed," stated Attorney General Clare E. Connors.  "The public is reminded that Mauna Kea Access Road is a public road controlled by DOT and that the current blockade is unlawful."

At this time, DOT has restricted access on Mauna Kea Access Road to preserve public health and safety, and to carry out its responsibilities under HRS Ch. 264.[16]

(Emphases added.)

Defendants argue it is irrelevant which entity asserted jurisdiction and control over the MKAR "because Plaintiffs'

---

[16] Joint Statement on the Jurisdiction of Mauna Kea Access Road, Department of Hawaiian Home Lands (Aug. 30, 2019), https://dhhl.hawaii.gov/2019/08/30/joint-statement-on-the-jurisdiction-of-mauna-kea-access-road/ [https://perma.cc/J4YS-7R7W] (emphases added).

breach of trust claims stem from the uncompensated use of MKAR as a public road, which indisputably started prior to July 1, 1988 and continues to the present day."

Defendants are wrong.  The 2018 designation of the MKAR as a state highway wrongfully transferred control over Hawaiian home lands from DHHL to DOT.  The 2019 joint statement — carrying the authority of the Attorney General and DHHL — confirmed the illegal taking.  The State's failure to abide by proper procedures for disposing trust land constituted a new breach of trust not barred by Act 14 of 1995.

Further, and critically, the land transfer protections of the Hawaiian Homes Commission Act attach when, as here, there is no transfer of legal title to the land. Based on counsel's statements at oral argument, fee title to the MKAR was not transferred out of the trust.  The only documents in the record that divulge what happened between the DHHL and the DOT are the internal memo requesting designation of the MKAR as a state highway, and the later joint statement on jurisdiction.  The land does not appear to have been sold or leased, as there is no deed of conveyance, lease, or any other record of the alienation of fee title to the land.

But the State's actions created an effective taking of the MKAR — enough to implicate the purposes of the Hawaiian Home Lands trust and trigger the protections imposed by the HHCA.

As the joint statement curtly and wrongly asserted, "[b]eneficiaries of the [HHCA] do not own Mauna Kea Access Road. Act 14 (1995) resolved all claims concerning the use of Hawaiian home lands for public roads and highways built before and after statehood."

> The principal purposes of the HHCA include:
>
> (1) Establishing a permanent land base for the benefit and use of native Hawaiians, upon which they may live, farm, ranch, and otherwise engage in commercial or industrial or any other activities as authorized in this Act;
> (2) Placing native Hawaiians on the lands set aside under this Act in a prompt and efficient manner and assuring long-term tenancy to beneficiaries of this Act and their successors;
> (3) Preventing alienation of the fee title to the lands set aside under this Act so that these lands will always be held in trust for continued use by native Hawaiians in perpetuity;
> (4) Providing adequate amounts of water and supporting infrastructure, so that homestead lands will always be usable and accessible; and
> (5) Providing financial support and technical assistance to native Hawaiian beneficiaries of this Act so that by pursuing strategies to enhance economic self-sufficiency and promote community-based development, the traditions, culture and quality of life of native Hawaiians shall be forever self-sustaining.

HHCA § 101 (emphasis added).

Here, DOT's unilateral designation of the MKAR as a public highway took almost all property rights from DHHL. As the Plaintiffs point out in their reply brief,

> The 2018 designation unilaterally removed the "maintenance and operation" of the road from the home lands trust and placed it with DOT for the first time and in a way that was never done with any other agency previously. HRS § 26-19. The designation allows DOT to close and restrict use of the Access Road at its own discretion. It prohibits DHHL and beneficiaries from installing infrastructure on or near the road without obtaining a written permit. HRS § 264-6. It prohibits DHHL and beneficiaries from connecting a new road

40

> or access to the Access Road without a DOT permit. HRS §
> 264-14. It allows DOT and the governor to further encumber
> or alienate the Access Road by granting "easements within"
> and "access rights along" the Access Road and adjoining
> trust lands. HRS § 264-13. It gives DOT the ability to seek
> fines or imprisonment of "any person, including any public
> officer or employee" including DHHL and their beneficiaries
> who do not obtain required permits from DOT. HRS § 264-12.

And DOT can only designate a road as a state highway if it owns that road. HRS § 264-1. How could DOT designate the MKAR a state highway if it did not own it? Through the designation, DOT took from DHHL and the beneficiaries the right to control, the right to exclude, the right to encumber, and the right use the land for non-trust purposes. So, apart from retaining legal title, what other sticks in the property bundle did DHHL have left?

Granted, the HHCA provisions regarding selling, leasing, and exchanging land in the trust do not clearly account for when another entity takes rights to the land not including title — as DOT did here. Nonetheless, any transfer of land from DHHL to another entity ought to and must proceed "in the manner and for the purposes set out in [the HHCA]." HHCA § 205. To allow land to transfer without doing so would be to ignore the HHCA's rehabilitative and trust purposes. See HHCA § 101.

The result here is that both DOT and DHHL are at fault. DOT did not have the authority to unilaterally designate the MKAR as a state highway. And although the record is unclear as to DHHL's actions in 2018, it certainly should not have

41

relinquished "control and jurisdiction" without consulting with the beneficiaries as required by 43 C.F.R. § 47.  Such acquiescence deprived Native Hawaiian beneficiaries of income from and use of the land — an abandonment of mālama 'āina, or care for the land.  DHHL's own Beneficiary Consultation Policy[17] emphasizes the point here:

> As an agency entrusted to administer, manage, and invest trust resources to accomplish a variety of goals and objectives that benefit native Hawaiians and their successors, the Hawaiian Homes Commission and Department of Hawaiian Home Lands recognizes that meaningful, timely and effective beneficiary consultation is essential to the successful implementation of Commission/Department policies, programs and projects.

To relinquish control of the road leading to Maunakea, a site of major spiritual significance to Native Hawaiians,[18] without the type of "meaningful, timely, and effective beneficiary consultation" that is "essential to the successful implementation of Commission/Department policies, programs[,] and projects," is to breach the fiduciary duty imparted by the HHCA.  Critical to the protections of the HHCA is transparency, an element that was sorely lacking here.  Before control of and jurisdiction over trust land leaves DHHL (even if legal title

---

[17]  Dep't of Hawaiian Home Lands Beneficiary Consultation Policy, Department of Hawaiian Home Lands, https://dhhl.hawaii.gov/po/beneficiary-consultation/beneficiaryconsultation-policy-summary/ [https://perma.cc/BN5Z-UB46].

[18]  See Meaning of Maunakea, University of Hawai'i at Hilo Center for Maunakea Stewardship, https://hilo.hawaii.edu/maunakea/culture/meaning#:~:text=Maunakea%20or%20Mauna%20Kea%3F,as%20the%20proper%20Hawaiian%20usage [https://perma.cc/9P39-QEZ4].

does not) like it did here, DHHL must consult with the beneficiaries.[19]

Thus, land designated as Hawaiian home lands <u>must remain under the control of the DHHL</u> unless the land is sold or exchanged consistent with the HHCA. See HHCA §§ 204 (a)(3), 205. There is nothing in the record indicating a land exchange or sale was completed pursuant to HHCA §§ 204(a)(3) and 205 that legally removed the Hawaiian home lands underlying the MKAR from the trust. Moreover, it appears beneficiaries were never consulted prior to the taking as required by 43 C.F.R. § 47.10. The DOT's 2018 designation of the MKAR as a state highway and the joint statement's assertion that the MKAR "is under the control and jurisdiction of DOT" clearly violate the HHCA.

The State blatantly disregarded unambiguous requirements of the HHCA, and in doing so, breached its constitutional and fiduciary obligation to faithfully carry out the HHCA. Haw. Const. art. XII, § 2; Ahuna, 64 Haw. at 338, 640 P.2d at 1168.

The 2018 designation, which took away the DHHL's control over the MKAR and transferred it to the DOT, therefore triggered <u>new claims</u> unrelated to the public use and mismanagement claims

---

[19] See Dep't of Hawaiian Home Lands Beneficiary Consultation Policy, Department of Hawaiian Home Lands, https://dhhl.hawaii.gov/po/beneficiary-consultation/beneficiaryconsultation-policy-summary/ [https://perma.cc/BN5Z-UB46].

that arose between August 21, 1959 and July 1, 1988.  Act 14

simply does not preclude Plaintiffs' suit.

Section 1 of Act 14 indicates the legislature believed the

final resolution of Hawaiian home lands claims against the State

was "necessary and in the best interests of the State and

beneficiaries of the trust" given the uncertainty and expense of

judicial resolution of such claims.  1995 Haw. Sess. Laws Act 14

§ 1 at 697.  The legislature "acknowledge[d] that this Act

represent[ed] an opportunity to effectuate the purposes of the

HHCA."  1995 Haw. Sess. Laws Act 14 § 1 at 698.  As noted above,

the principal purposes of the HHCA include:

> (1) Establishing a permanent land base for the benefit and use of native Hawaiians, upon which they may live, farm, ranch, and otherwise engage in commercial or industrial or any other activities as authorized in this Act;
> (2) Placing native Hawaiians on the lands set aside under this Act in a prompt and efficient manner and assuring long-term tenancy to beneficiaries of this Act and their successors;
> (3) Preventing alienation of the fee title to the lands set aside under this Act so that these lands will always be held in trust for continued use by native Hawaiians in perpetuity;
> (4) Providing adequate amounts of water and supporting infrastructure, so that homestead lands will always be usable and accessible; and
> (5) Providing financial support and technical assistance to native Hawaiian beneficiaries of this Act so that by pursuing strategies to enhance economic self-sufficiency and promote community-based development, the traditions, culture and quality of life of native Hawaiians shall be forever self-sustaining.

HHCA § 101.  Ruling that Act 14 precludes Plaintiffs' suit would

be inapposite to the purposes of the HHCA.  Relegating

beneficiaries to suing to enforce the land exchange in Act 14

ignores the fundamental issue that the State took Hawaiian home lands in contravention of the HHCA.  Beneficiaries cannot reap the benefits of the trust if they are prevented from enforcing the law that was created to contribute to their prosperity.  Act 14 was intended to efficiently resolve beneficiaries' claims; it did not enable the State to take trust land and avoid legal consequences.  The DOT's act in 2018 of assuming control over the MKAR is beyond any controversy Act 14 purported to settle and violates the HHCA.

### 3. HRS § 673-4 provides relief for Plaintiffs

In their complaint, Plaintiffs request the circuit court, inter alia, "[a]ward land and/or money damages to restore the Hawaiian home lands trust[.]"  HRS § 673-4 (2016) provides the type of relief available for a suit brought under the chapter:

> **[§673-4] Scope of relief.** (a) In an action under this chapter[,] the court may only award land or monetary damages to restore the trust which has been depleted as a result of any breach of trust duty and no award shall be made directly to or for the individual benefit of any particular person not charged by law with the administration of the trust property; provided that actual damages may be awarded to a successful plaintiff.

(Emphasis added.)  Plaintiffs' request matches the relief authorized under chapter 673.  See Nelson, 130 Hawai‘i at 171, 307 P.3d at 151.  Consequently, Plaintiffs may receive land or money damages for claims after 2018.

45

## C. HRS chapter 264

Plaintiffs also argue "Defendants violated its own authorizing statute when it designated the [MKAR] a State Highway without a deed of conveyance or order of condemnation." Defendants do not dispute that HRS chapter 264 procedures were not followed. They instead argue that Plaintiffs are prohibited from challenging the 2018 designation of MKAR as a state highway under HRS § 264-42 because the statute does not create a private right of enforcement action, and even if it did, Plaintiffs do not have standing.

It is not necessary to analyze the merits of the parties' arguments regarding HRS chapter 264 because, as explained in Section IV.B., the 2018 designation of the MKAR as a state highway constituted a breach of the State's constitutional and fiduciary obligation to faithfully carry out the HHCA. Haw. Const. art. XII, § 2; Ahuna, 64 Haw. at 338, 640 P.2d at 1168. Lands that are designated as Hawaiian home lands are under the control of the DHHL and must be used and disposed of in accordance with the HHCA. See HHCA § 204(a). The DHHL failed to prevent the DOT from illegally assuming control and jurisdiction over the MKAR in 2018.

It is troubling that the DOT unilaterally designated the MKAR as a state highway via an internal memo. Instead of following the procedures for a land exchange or sale as

46

described in HHCA sections 204(a)(3) and 205 and 43 C.F.R. part 47, the State - particularly the HHC members and DHHL - blatantly breached their fiduciary duties by allowing the illegal taking and then failing to remedy the designation that violated the HHCA.  Hence, the MKAR was not properly designated a state highway.

## V.    Conclusion

For the foregoing reasons, the circuit court's grant of summary judgment to Defendants was erroneous.  We therefore vacate the circuit court's order granting summary judgment to Defendants and remand with instructions to enter an order granting summary judgment to Plaintiffs and for further proceedings consistent with this opinion.

Ashley K. Obrey
for plaintiffs-appellants

Ewan C. Rayner
for defendants-appellees

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Peter T. Cahill

/s/ Clarissa Y. Malinao

